[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-4061

_____

D. C. Docket No. 94-6114-CR-HIGHSMITH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FLOYD MCLEAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 16, 1998)**

Before EDMONDSON and BIRCH, Circuit Judges, and FAY, Senior Circuit Judge.

FAY, Senior Circuit Judge:

A grand jury charged Floyd McLean in a four-count indictment with one count of conspiracy to possess with intent to distribute crack cocaine, two counts of possession with intent to distribute crack cocaine, and one count of doing so while carrying a firearm. A jury convicted him on all counts, and he was sentenced to 405 months on the conspiracy and possession charges and 60 months, to be served consecutively, on the firearm charge. He appeals both the conviction and the sentence, and we affirm.

I

The Gucci Hole is the street name for a location in Fort Lauderdale, Florida infamous for the sale of cocaine and marijuana. There, it is alleged, interested buyers can purchase cocaine of unrivaled purity and popularity, earning it the "Gucci" label. This location, and the organization that sold narcotics therein, was the subject of an investigation by federal and state law enforcement officers. The appellant was a high-ranking member of the Gucci Hole organization and a target of the investigation. McLean received powder cocaine from the leader of the organization, "Tux" a/k/a Terrance Mohamed, "cooked" it into crack cocaine, and distributed it to street peddlers. McLean then collected the sales proceeds and returned them to Terrance Mohamed.

In order to facilitate the investigation of the Gucci Hole, law enforcement officers set up an apartment in Fort Lauderdale from which they conducted undercover operations. They equipped the apartment with video and audio monitoring devices. Two confidential informants, "Barbara" and "Richard," contacted McLean in order to set up a controlled sale of a quantity of crack cocaine and an AK-47 assault rifle at the undercover apartment. Richard pretended to be a drug dealer who wanted to buy "Gucci" crack cocaine for distribution in Georgia, and Barbara pretended to be Richard's cousin. McLean had several recorded telephone conversations with the informants and agreed to deliver 550 rocks of crack in return for $5,500.

On October 28, 1993, McLean arrived at the undercover apartment accompanied by his wife and co-defendant Anthea Harris. In view of the informants and the video camera surreptitiously taping the encounter, McLean retrieved a bag containing 600 rocks of crack

2

cocaine from his wife's purse. From this bag he gave Barbara 550 rocks and allowed her to count them, returning the excess 50 rocks to his wife's purse. McLean counted the $5,500 that was his payment and handed it to his wife, who put the money in her purse. Before leaving the undercover apartment, McLean showed the informants that he was carrying a nine millimeter handgun. Neither McLean nor Harris was immediately arrested for their participation in the controlled sale.

On March 23, 1994, in connection with undercover law enforcement directed at implicating Terrance Mohamed, Barbara and Richard set up a meeting at which McLean and Lionel Mohamed, Terrance's brother, were present. McLean and Lionel Mohamed left the meeting together. Police officers stopped the car that McLean was driving and arrested Lionel Mohamed pursuant to a warrant. A nine millimeter Glock semi-automatic handgun belonging to McLean was seized from the glove compartment, but McLean was not arrested or charged with the firearm's possession at that time.

On May 18, 1994, McLean and Harris were arrested outside of their marital residence in Miramar, Florida. Harris consented in writing to the police's request to search the residence. Agents found 590.6 grams of crack cocaine in a cabinet under the kitchen sink, a ledger used for recording drug sales, and other drug paraphernalia used in "cooking" powder into crack cocaine. After being advised of their rights, both McLean and Harris gave statements to investigators. When asked if she knew where McLean obtained the drugs, Harris replied, "He gets it from 'Tux'."

A grand jury returned a four-count indictment against McLean and his wife. They both were charged with conspiracy to possess with intent to distribute crack cocaine in violation of 21

3

U.S.C. §§ 841(a)(1) and 846; with possession of crack cocaine with intent to distribute on October 28, 1993 in violation of 21 U.S.C. § 841(a)(1); and with possession of crack cocaine with intent to distribute on May 19, 1994 also in violation of 21 U.S.C. § 841(a)(1). McLean individually was charged with the additional count of using or carrying a firearm in relation to the aforementioned drug trafficking crimes in violation of 18 U.S.C. § 924(c).

The case against McLean and his wife proceeded to trial on September 20, 1994. During its case-in-chief, the government offered the testimony of law enforcement officers and of the confidential informants Barbara and Richard to describe the October 1993 controlled sale, the March 1994 traffic stop and handgun seizure, and the May 1994 arrest and search. To corroborate this testimony, the government presented audio tapes of telephone conversations between McLean and the informants and both video and audio recordings of the controlled sale. Harris testified in her own behalf and explained that she did not know that, on October 28, 1993, she was accompanying her husband on a drug deal. She also testified that she was unaware of the presence in her house of the crack cocaine and other drug paraphernalia. McLean did not testify at trial, but in his closing argument McLean's counsel argued that there was no conspiracy between McLean and his wife and that McLean was unaware of the cocaine slab found under his kitchen sink.

In addition to the evidentiary issues and prosecutorial conduct discussed at length below, the trial was marked by McLean's counsel's repeated requests for a severance of the trials of McLean and his wife. Upon Harris's counsel's opening statement, it was clear that Harris's theory of the case was that while she suspected her husband's participation in the drug trade, she had neither direct knowledge of nor participation in those illicit activities. Therefore, she did not

4

conspire with her husband and had no knowledge of either the crack cocaine in her purse or under her kitchen sink. She so testified in her case-in-chief. Although McLean does not appeal the district court's denial of his motion to sever, he does argue that Harris's testimony incriminated him and that had the trials been severed, she could have exercised her spousal privilege to refuse to testify against him.

The jury returned verdicts of guilty against McLean on all four counts charged in the indictment. The jury convicted Harris on two counts, but acquitted her on the charge of possession with intent to distribute the 590 grams of crack found under her sink. McLean filed a timely motion for new trial on the grounds that the district court should have granted his motion to sever his wife's trial. This motion was amended to add one additional ground – that McLean's trial counsel was ineffective because he did not urge Harris's counsel to inform Harris that she retained a spousal privilege not to testify against her husband. The motion was denied.

The government gave McLean notice before trial that it would seek to enhance his sentence because of his prior conviction in the Florida courts for delivery of cocaine. At his sentencing hearing, McLean argued that the government could not do so because of its failure to comply with 21 U.S.C. § 851. That section details the procedures the government must follow in order to prove a defendant's prior conviction for sentence enhancement purposes. The district court rejected these argument that are discussed in more detail below. The court agreed with the government that McLean's base offense level for the three trafficking charges was 40, including a four level enhancement for McLean's role as organizer and leader, resulting in a guideline range of 324 to 405 months. The court sentenced McLean to the maximum 405 months for the trafficking charges and to 60 months, to be served consecutively, for the firearm charge.

5

McLean presses four arguments on appeal. First, he argues that the cumulative effect of the erroneous admission of prejudicial evidence and the prosecutor's clear misconduct during his closing argument required a mistrial. Second, he argues that the evidence was insufficient to support a conviction on the charge of possession with intent to distribute the 590.6 gram slab of crack found under his kitchen sink. Third, he contends that the district court abused its discretion by not granting McLean a new trial on the ground that his trial counsel was ineffective. Last, he attacks his sentence arguing that he did not receive the required notice of the government's intent to seek an enhancement based on his prior conviction.

II

McLean's main contention on appeal is that the district court abused its discretion when it denied his trial counsel's repeated requests for a mistrial on the grounds of erroneously admitted prejudicial evidence and prosecutorial misconduct. He argues that the district court erroneously admitted a large amount of prejudicial evidence related to McLean's involvement in the Gucci Hole organization, overruling his attorney's objections and denying his motion for mistrial. In addition, McLean argues that evidence of his previous arrest and punishment by a Florida court for cocaine delivery was improperly admitted in the government's case-in-chief. Finally, McLean cites the prosecutors's improper reference to "crack-addicted babies" in his closing argument. The cumulative effect of improperly admitted evidence and prosecutorial misconduct, McLean argues, resulted in an unfair trial and required a mistrial. We are convinced that the evidence concerning the Gucci Hole and describing McLean's involvement in that organization was "inextricably intertwined" with the evidence presented on the charges in the

6

indictment and was properly admitted. Additionally, the reference to McLean's prior conviction was also not extrinsic but was inextricably intertwined with the government's proof of the firearm count inasmuch as the evidence bore on McLean's possession of the firearm at the October 28, 1993 controlled sale. Finally, while we agree that the prosecutor's reference to "crack-addicted babies" was unprofessional and irresponsible, McLean cannot show prejudice in the face of the overwhelming evidence of his guilt.

A

Beginning with the government's opening statement in which the prosecutor described a "longstanding investigation [of] a rather extensive crack cocaine and marijuana distribution organization in Dade and Broward Count[ies]," McLean's counsel consistently objected to the introduction of evidence relating to the Gucci Hole organization, to McLean's participation in the organization, and to the government's investigation of the organization. On several occasions he moved for a mistrial. Each objection was overruled and each motion for mistrial was denied.

The contested evidenced was adduced mainly during the testimony of Detective Stack and the confidential informant Barbara. Detective Stack described, over objection, the Gucci Hole and the quality of the narcotics sold at that location. He identified other members of the Gucci Hole organization by their nicknames and described their roles in the organization. He also explained the recruitment of the confidential informants Richard and Barbara. Barbara testified extensively about the Gucci Hole and McLean's involvement with the organization. She testified that she worked at the Gucci Hole in 1992 and possibly in 1993. She testified that

she sold drugs at direction of the defendant. She said the following about McLean's role in the organization: "Floyd brought the dope. Super brought the dope. And they collected the money, mostly it was Floyd, Floyd used to come and collect money and check things out. Floyd was like the next to the head, head man." She stopped working for the Gucci Hole when the organization began to pay children to watch for policemen during drug transactions. She testified over objection that her son began working at the Gucci Hole, prompting her to get into contact with Detective Stack and to become an informant.

Following Barbara's testimony, McLean's counsel again moved for a mistrial, arguing that the Gucci Hole evidence related by Detective Stack and Barbara concerned incidents that occurred prior to the conspiracy alleged in the indictment, and was therefore irrelevant and prejudicial. McLean's counsel argued that he had not received any notice from the government of its intention to introduce extrinsic evidence of prior bad acts under Federal Rule of Evidence 404(b). The prosecutor responded by saying the evidence was available for review by McLean's counsel but he never availed himself of the opportunity to inspect it. The issue arose again at the charge conference when the district court asked whether a 404(b) instruction was necessary. For the first time, the prosecutor put forward the position that the "Gucci Hole" evidence was admissible because it was "inextricably intertwined" with the charges in the indictment.

The district court has broad discretion to determine the admissibility of evidence, and we will not disturb the court's judgment absent a clear abuse of discretion. See United States v. Ross, 131 F.3d 970, 987 (11th Cir. 1997). Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However,

8

> [e]vidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.

United States v. Ramsdale, 61 F.3d 825, 829 (11th Cir. 1995). "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985).

We are convinced that the Gucci Hole evidence was properly admitted. The record does not clearly demonstrate either the government's initial theory of admissibility or the court's rationale for admitting the Gucci Hole evidence. What the record makes clear is that the Gucci Hole evidence was vital to an understanding of the context of the government's case against McLean and, therefore, can be said to be "inextricably intertwined" with the government's proof of the charged offenses. For example, the evidence explained why McLean was the target of the government's investigation. It explained the relationship between McLean and the confidential informant Barbara and was vital to establishing her credibility. It explained the use of nicknames by members of the organization, such knowledge being necessary for the understanding of other pieces of evidence. It explained what the government alleged to be the goal of the conspiracy between McLean and Harris – the sale of "Gucci" crack cocaine to dealers in Georgia. The Gucci Hole evidence was a necessary part of the evidence relating to the charged offenses and was properly admitted by the district court.

McLean argues in the alternative that even if the Gucci Hole evidence is "inextricably intertwined" with evidence of the charged offenses, the prosecutor's initial reliance on a Rule 404(b) theory of admissibility prevents the government from so arguing on appeal. In Shepard v. United States, 290 U.S. 96 (1933), Dr. Shepard appealed his conviction for the murder of his wife. In the government's case-in-chief, the prosecution offered Mrs. Shepard's statement to her nurse from her deathbed, "Dr. Shepard has poisoned me," as a dying declaration to prove Dr. Shepard's guilt. The Supreme Court found that the record did not prove that Mrs. Shepard's statement to her nurse was made in the belief of her impending death and should not have been admitted as a dying declaration to prove the truth of the matter asserted. See id. at 99. The government then argued that, even if the statement could not be admitted as a dying declaration, the conviction should be affirmed because the statement could have come in for a non-hearsay use, as evidence of Mrs. Shepard's state of mind. To that argument, the Court through Justice Cardozo said the following:

> A trial becomes unfair if testimony thus accepted may be used in an appellate court as though admitted for a different purpose, unavowed and unsuspected. Such at all events is the result when the purpose in reserve is so obscure and artificial that it would be unlikely to occur to the minds of uninstructed jurors, and even if it did, would be swallowed up and lost in the one that was disclosed.

Id. at 103 (citation omitted).

This is not a case in which the Shepard rule would apply. First, as we have stated, the record is not clear as to the prosecutor's initial theory of admissibility or as to the district court's reasons for admitting the Gucci Hole evidence. There was, in fact, only very abbreviated argument on the issue. Second, the "theory in reserve" was raised in the district court, and defense counsel had the opportunity to request an instruction that would have prevented the

10

danger of "uninstructed jurors."  Third, even if the "theory in reserve" had been raised for the first time in this court, the use of the evidence by the jury under a 404(b) theory or an "inextricably intertwined" theory is not materially different.  See United States v. Williams, 837 F.2d 1009, 1013 (11th Cir. 1988) ("the basic unfairness in [Shepard] derived from the government's attempt to justify the admission of Mrs. Shepard's statement on a theory wholly unrelated to the ground advanced at trial").  In contrast, the theories in Shepard would have put the evidence to very different uses – on the one hand, substantive proof of Dr. Shepard's guilt and on the other, evidence rebutting an argument that Mrs. Shepard committed suicide.  This case is very different from Shepard, and its rule does not apply.

B

McLean also assigns as error the admission of evidence concerning his previous arrest and punishment for cocaine delivery.  Alcohol, Tobacco and Firearms Agent Pamela Bradley testified for the government about the nine millimeter handgun seized at the March 23, 1994 traffic stop.  Over McLean's counsel's relevancy objection, the court permitted her to testify about her interrogation of the defendant at the time of the seizure.

> WITNESS: I asked Mr. McLean where he got the firearm and he told me that he had purchased it from an Army Navy surplus store around I-95 and Biscayne in the Miami area.  He told me he had purchased the weapon back in early 1993, prior to being picked up by INS and later at a later date he was arrested by Ft. Lauderdale and received an adjudication withheld for which his probation expired in 1994.

> MR. ROBBINS: I object to this and move for mistrial.

> THE COURT: Overruled.

> BY MR. BOMA:

Q.      You may continue.

A.      He told me his probation had expired in 1994.

Q.      When did he purchase that weapon according to what he told you?

A.      He told me that he believed he had purchased it in early 1993 but he remembered that it was prior to his being picked up by INS.

McLean argues that Agent Bradley's reference to his arrest and probation was improper character evidence. It is clear that the purpose of this evidence was not to attack McLean's character but to corroborate the confidential informants' testimony about McLean's October 28, 1993 possession of a nine-millimeter handgun at the controlled sale. McLean's reference to his arrest and subsequent adjudication put his ownership of the handgun into a chronological context and established that he did, in fact, own a nine-millimeter handgun at the time that the informants testified to seeing it. Therefore, the evidence was relevant to a charged offense and was properly admitted over objection.

C

McLean argues that in addition to sustaining an objection to the following excerpt from the prosecutor's closing argument, the district court should have granted McLean's request for a mistrial and the failure to do so requires reversal.

> The Government would submit to you that based upon the testimony of the witnesses, there is something unique and distinctive about crack cocaine. And we speak here today not only on behalf of the Government of the United States and it's [sic] people but also upon the people, on behalf of the people who have no

voice. Those are the crack addicted babies languishing in hospitals around the country.

We agree that nothing about this excerpt from the prosecutor's closing statement has anything to do with "the testimony of witnesses" or with McLean's guilt or innocence. It is a blatant appeal to the fears and prejudices of jurors and is obviously improper. Nonetheless, the government is saved from constitutional error by the overwhelming evidence against McLean.

While we appreciate zealous advocacy, argument pertaining to the emotions and not to the evidence is not to be tolerated. We recognize that serving as a prosecutor is one of the most difficult roles within the legal profession. Those attorneys who are clothed with the authority of the United States of America should not bear the responsibility lightly – they are charged not only with the enforcement of federal law but also with the maintenance of the highest ethical standards. We encourage trial judges, primarily responsible for safeguarding the integrity of our courts, to punish all lawyers whose arguments violate the high standards we should all demand.

III

McLean argues that the evidence was insufficient to support his conviction on count three of the indictment, the possession with intent to distribute the nearly 600 grams of crack cocaine seized from beneath his kitchen sink on May 18, 1994. The sufficiency of the evidence produced at trial is a question of law that we review do novo. See United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990). We will affirm the jury's verdict if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in the

government's favor, we find that a reasonable fact finder could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt. Id.

Law enforcement officers discovered the cocaine under McLean's kitchen sink after receiving Harris's consent to search their residence. In addition to the cocaine, they found items used to cook and measure cocaine and ledgers used, according to witnesses, to keep track of the amount of drugs bought and sold. The jury also heard evidence from Detective Stack and from Barbara that McLean was a drug dealer, highly ranked in the Gucci Hole organization. There was ample evidence from which the jury could have concluded beyond a reasonable doubt that McLean possessed the crack cocaine with intent to distribute.

IV

McLean raises what we believe to be a novel ineffective assistance of counsel claim. He argues that his trial counsel should have set in motion events that would have resulted in Harris's exercise of her spousal privilege not to testify against McLean and required the severance of their trials. See Zafiro v. United States, 506 U.S. 534 (1993). The failure to advise McLean to tell his wife to exercise her privilege, or the failure to urge Harris's counsel to so advise his client, the argument goes, rendered the representation constitutionally ineffective. We generally do not hear claims of ineffective assistance counsel on direct appeal because there seldom has been sufficient opportunity to develop the record with regard to the merits of these claims. See United States v. Camacho, 40 F.3d 349, 355 (11th Cir. 1994). Such it is in this case. McLean can save his argument for a 28 U.S.C. § 2255 proceeding where an evidentiary hearing can be held in order to allow the development of a record. Id.

14

McLean raises two issues with regard to his sentencing, both concerning the government's alleged failure to comply with the requirements for proving a prior conviction for enhancement purposes found at 21 U.S.C. § 851.  First, he argues that § 851 requires the government to notify a defendant of its intention to seek an enhancement by filing an information alleging the prior conviction and that the Notice filed in this case did not comply.  Second, he argues that because the enhancement sought by the government exceeded three years, the government was required to allege the prior conviction in an indictment.  We review the district court's rejection of these arguments de novo.  See United States v. Rojas, 47 F.3d 1078, 1080 (11th Cir. 1995).

> Section 851(a)(1) states as follows:
>
> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous conviction to be relied upon.

McLean asserts that the "Notice of Intent to Rely Upon Sentencing Enhancement under 21 U.S.C. 841(b) and 851" was not sufficient because it was not an "information" within the meaning of § 851.  We can think of no principle or rationale that would justify such an interpretation.  The "Notice" delivered to McLean charged him with the previous conviction as required by § 851(a)(1) and allowed him the opportunity to contest the previous conviction under

the procedures outlined at § 851(b). We agree with the district court that the "Notice" qualified as an "information" within the meaning of § 851(a)(1).[1]

Section 851(a)(2) adds another requirement if the sentencing enhancement sought by the government exceeds three years.

> An information may not be filed under this section if the increased punishment which may be imposed is imprisonment for a term in excess of three years unless the person either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed.

In United States v. Harden, 37 F.3d 595, 601 (11ᵗʰ Cir. 1994), we held that this ambiguous subsection requires the government to do what the Fifth Amendment already requires, prosecute by indictment every offense for which the government seeks an enhancement of more than three years. In so holding, we considered and rejected Harden's argument that we must avoid an interpretation that rendered the statute superfluous. Id. McLean, in effect, asks us to revisit Harden in order to find an interpretation of § 851(a)(2) that does not render the subsection superfluous. His suggestion is that we interpret the subsection to require the prior conviction itself to be alleged in an indictment. We believe that § 851(a)(2) is not even arguably susceptible to this interpretation and that his argument is foreclosed by our Harden decision. We find no defect in the nature of the notice afforded to McLean of the government's intention to seek a sentencing enhancement.

---

[1] The Olson case cited by McLean is not inconsistent with this result. There, the defendant's sentence could not be enhanced because the government had provided no notice whatsoever of its intentions and, accordingly, Olson could not contest its information. See United States v. Olson, 716 F.2d 850, 851 (11ᵗʰ Cir. 1983). Here, McLean had notice and could have contested either the fact of his prior conviction or its constitutionality.

16

## VI

For the foregoing reasons, McLean's conviction and sentence are AFFIRMED.