[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 24, 2005
THOMAS  K. KAHN
CLERK

No. 04-12751
Non-Argument Calendar

_____

D.C. Docket No. 03-00150-CR-3-002-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRADFORD S. POTTS,
SHELTON PERDUE,
a.k.a Shelton M. Perdue,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Northern District of Florida

_____

**(May 24, 2005)**

Before BIRCH, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Bradford S. Potts and Shelton Perdue (collectively Appellants) appeal their convictions for conspiracy to distribute and possess with intent to distribute cocaine powder and cocaine base ("crack cocaine"), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and (iii), 846. Both appellants argue that the evidence presented at trial did not establish beyond a reasonable doubt that they were guilty. Furthermore, Perdue argues that the district court erred when it allowed testimony regarding drug transactions outside the time frame of the charged conspiracy and that the district court committed plain error under United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005), when it based Perdue's sentence on a drug weight higher than the threshold amount found by the jury. After reviewing the record, we agree with the district court and **AFFIRM.**

## I. BACKGROUND

Marlin Purifoy and Michael Robinson are cousins who made their living selling cocaine in Pensacola, Florida. Purifoy testified that he was introduced to the defendant, Perdue, in December of 2002 because he needed to buy cocaine. At that time, Purifoy purchased two or three ounces of cocaine from Perdue, but did not deal with Perdue on a regular basis until May of 2003.

Between May of 2003 and December 2003, Purifoy testified that he began to regularly purchase cocaine from Perdue. During the time of the alleged

conspiracy, Perdue lived in Copperas, Texas and would travel to Pensacola to sell cocaine. Perdue and Purifoy arranged the transactions by cellular phone whenever Perdue was in town. Purifoy testified that he bought cocaine from Perdue six or seven times during this period. Each time he purchased two or three ounces of cocaine that he would later cook into crack cocaine.

In about April of 2003, Purifoy introduced Perdue to Robinson who was recently released from prison. Purifoy testified that Robinson knew how to cook cocaine into crack form, and he introduced them because Perdue needed someone to cook the cocaine. After the introduction, Robinson testified that he dealt directly with Perdue. Robinson estimated that he met with Perdue two or three times per month from June to December of 2003. On each occasion Robinson would purchase[1] one or two ounces of cocaine or crack cocaine. Though Perdue regularly sold cocaine to Purifoy and Robinson, he also sold to others in the Pensacola area, and on one occasion Purifoy testified that Perdue had between 30 and 35 ounces of cocaine in his possession when meeting with Purifoy.

Both Purifoy and Robinson testified that when Perdue traveled to Pensacola, he always had someone else with him to help sell cocaine. Robinson testified that

---

[1]Some transactions involved Perdue giving Robinson cocaine to sell on credit. After a sale, Robinson would repay Perdue.

the second defendant, Potts, was present at two drug transactions between Robinson and Perdue starting in June of 2003. The second time Robinson met Perdue was during a cocaine transaction with Perdue on 3 December 2003, Potts also had cocaine to sell, but Robinson did not buy from Potts.

Purifoy met Potts on 4 December 2003 at Penton's, a car interior shop. There, Purifoy bought crack cocaine and sport jerseys from Perdue and Potts, respectively. Meanwhile, Purifoy testified that Robinson arrived and talked with Perdue alone for five or six minutes. During this time, Potts mentioned to Purifoy how cheap cocaine was in Texas and how they were profiting from buying cocaine in Texas and selling it in Pensacola. Then, the four drove to Purifoy's girlfriend's house where Purifoy hid the crack he bought from Perdue.

Later that night, the Escambia County Sheriff's Department executed a search warrant for Purifoy's girlfriend's house and seized the crack cocaine Purifoy had hidden. Purifoy agreed to cooperate with law enforcement and identified Perdue as the source of the crack. After failing to contact Perdue by telephone, Purifoy then called Robinson. Robinson indicated Perdue had left town. Purifoy then said he needed cocaine, and Robinson brought over the cocaine he received from Perdue. The police then arrested Robinson when he arrived who then agreed to cooperate in finding Perdue.

4

That night Purifoy and Robinson searched the hotels where Perdue typically stayed and found his car. The next day Perdue called Robinson, and Robinson immediately notified Officer Scott Allday of the call. Allday then monitored two calls between Robinson and Perdue in which Robinson arranged to meet Perdue.

Robinson testified that Allday wired him to record the conversation with Perdue at the meeting and drove him to meet Perdue. Allday gave Robinson $1,500 to purchase cocaine from Perdue. When Perdue arrived, Robinson entered his car, gave Perdue the $1,500, and complained about the quality and weight of the cocaine he received earlier. Perdue gave Robinson two ounces of cocaine and said he would need to get a float scale to measure out an additional two ounces. Robinson then exited Perdue's car, and as Perdue drove away, he was stopped and arrested. The $1,500 was recovered from Perdue's car.

After his arrest, Perdue refused to give consent to the officers to search his hotel room, so the Sheriff's Department began the process to obtain a warrant. They surveiled the hotel room at the Hospitality Inn rented in Potts's name. When Potts returned to the room, officer's stopped him, identified themselves, and asked for his consent to search the hotel room. After his refusal of consent, Officers obtained a warrant and searched the hotel room where they found 1) a set of hand

5

scales, 2) plastic baggies with white residue, 3) a cellular phone, 4) marijuana, and 5) multiple articles of clothing with $1800, $1500, and $480 cash in the pockets.

A DEA chemist testified at trial to the amount of cocaine and cocaine based seized during the case. The individual amounts of crack cocaine seized weighed 31.9 grams, 4.3 grams, and 25.7 grams. The cocaine powder weighed 19.0 grams and 52.8 grams.

Further, the government called two law enforcement officials from Copperas Texas to testify about Potts's drug activity in Texas. The officers testified that they conducted a valid search of Potts's residence in August of 2003 and found 3.45 grams of crack cocaine in his freezer.

The cellphone records of Perdue, Potts, Robinson, and Purifoy were also analyzed during the case. They indicated that the four alleged conspirators were communicating during the time frame in question.

At trial, Perdue objected to testimony concerning the drug transaction in December of 2002 because it was out of the time frame charged for the conspiracy. The trial court overruled that objection, and on 3 March 2004, the jury found both Perdue and Potts guilty of conspiracy to distribute and possess with intent to distribute at least 5 kilograms of cocaine powder and 50 grams of crack cocaine.

## II. DISCUSSION

Appellants argue on appeal that the evidence presented at trial did not establish beyond a reasonable doubt that they were guilty. Furthermore, Perdue argues that the district court erred when it allowed testimony regarding drug transactions outside the time frame of the charged conspiracy and that the district court committed plain error under Booker when it based Perdue's sentence on a drug weight higher than the threshold amount found by the jury.

### A. Sufficiency of the Evidence

In regards to the sufficiency of evidence claim, Perdue and Potts specifically assert that the government failed to demonstrate that they had arrived at a mutual understanding with any other person to distribute cocaine and crack cocaine. The Appellants contend that the only evidence presented by the government to demonstrate the existence of a conspiracy was the testimony of their alleged co-conspirators, who falsely implicated them in an effort to reduce their own sentences.

We review the sufficiency of the evidence de novo. United States v. Gil, 204 F.3d 1347, 1349 (11th Cir. 2000) (per curiam). "When faced with a challenge to the sufficiency of the evidence, we must examine the evidence in a light most favorable to the jury's verdict, draw all reasonable inferences in favor of the

verdict, and determine whether the evidence presented was sufficient for a reasonable jury to reach a conclusion of guilt beyond a reasonable doubt." United States v. Bush, 28 F.3d 1084, 1087 (11th Cir. 1994). To convict for a conspiracy to distribute drugs, the jury must find: (1) an agreement between two or more persons to distribute the drugs; (2) the defendant knew of this goal; and (3) the defendant knowingly joined or participated in the venture. See United States v. Matthews, 168 F.3d 1234, 1245 (11th Cir. 1999), as amended, 181 F.3d 1205 (11th Cir. 1999). The government does not need to prove the existence of a formal agreement, but rather may rely on circumstantial evidence to show "a meeting of the minds to commit an unlawful act." United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998) (internal quotation and citation omitted). We have held that, unless testimony is "incredible as a matter of law," credibility determinations are the exclusive province of the jury. United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997) (internal quotation omitted). "For testimony of a government witness to be incredible as a matter of law, it must be unbelievable on its face." Id. (internal quotation omitted).

Here, the jury apparently found the co-conspirators' testimony to be credible, and this testimony was not "incredible as a matter of law." Further, the government presented evidence of cell phone conversations and drug activity in

8

the hotel room where Potts and Perdue were staying, which is at least circumstantial evidence of a conspiracy or "meeting of the minds." This evidence was sufficient to support the Appellants' convictions.

Perdue next argues that the district court abused its discretion by admitting evidence regarding drug transactions that occurred in December of 2002 and April of 2003, which did not take place within the time-frame of the conspiracy as alleged in the indictment. He contends that the district court wanted to have this evidence admitted under Federal Rule of Evidence 404(b) evidence, even though the government did not provide notice. Perdue further asserts that the government failed to establish that these transactions were intended to be part of the conspiracy since, at the time of these transactions (1) he lived in Pensacola, Florida, and not Texas, which is where he lived during the time frame of the conspiracy, and (2) no regular contact occurred between him and either Purifoy or Robinson.

We review the district court's ruling on the admissibility of evidence for an abuse of discretion, United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000), and will reverse an erroneous evidentiary ruling "only if the resulting error was not harmless," United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999), corrected by 194 F.3d 1186 (11th Cir. 1999). Evidence of uncharged criminal

activities generally would be considered inadmissible extrinsic evidence under Rule 404(b). Jiminez, 224 F.3d at 1249. Such evidence, however, is admissible as intrinsic evidence of the charged offense if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998) (citation omitted). "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." Id. (internal quotations and citation omitted).

Here, the testimony was necessary to complete the story of the crime for the jury. Specifically, the prior drug transactions established how Purifoy and Robinson met Perdue and the motive behind the conspiracy. The district court did not abuse its discretion by allowing the admission of this testimony that occurred outside of the time frame of the conspiracy.

Perdue finally argues that, under Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004), the district court plainly erred by sentencing him using a drug

10

weight that was greater than the threshold amounts of 5 kilograms or more of cocaine and 50 grams or more of crack cocaine found by the jury. He asserts that, using 5 kilograms of cocaine and 50 grams of crack cocaine, his base offense level should have been 32, with a resulting guideline range of 188 to 235 months of imprisonment, but concedes that he would have been subject to a mandatory minimum sentence of 20 years of imprisonment due to a prior felony drug conviction. Perdue contends that, using the above calculations, he should have been sentenced to 240 months of imprisonment.

Because Perdue did not raise a constitutional objection to the district court's application of the Sentencing Guidelines, we review this issue only for plain error. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (applying plain error review to a Blakely claim that the appellant failed to raise in the district court). An appellate court may not correct an error that the defendant failed to raise in the district court unless there is "(1) error, (2) that is plain, and (3) that affects substantial rights." Id. (internal quotation and citation omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation and citation omitted).

In Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000), the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." The Court recently revisited that rule in the context of Washington State's sentencing guideline scheme, clarifying that

> the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. . . . In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.

Blakely, 542 U.S. at ___, 124 S. Ct. at 2537 (emphasis in original).

While the instant case was pending on appeal, the Supreme Court issued its decision in United States v. Booker, 543 U.S. ___, 125 S. Ct. 738, 749 (2005),[2] finding "no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue" in Blakely. Resolving the constitutional question left open in Blakely, the Court held that the mandatory nature of the Sentencing Guidelines rendered them incompatible with the Sixth Amendment's guarantee to the right to a jury trial. Id. at ___, 125 S. Ct.

---

[2] Consolidated with United States v. Fanfan, No. 04-105 (U.S. Jan. 12, 2005).

at 749-51.  In extending its holding in <u>Blakely</u> to the Sentencing Guidelines, the Court explicitly reaffirmed its rationale in <u>Apprendi</u> that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  <u>Id.</u> at ___, 125 S.Ct. at 756.  The Court effectively rendered the Sentencing Guidelines advisory only, explaining that district courts are not bound to apply the Sentencing Guidelines, but "must consult those Guidelines and take them into account when sentencing."  <u>Id.</u> at ___, 125 S.Ct. at 764-67.

In <u>Rodriguez</u>, we recently reviewed an appeal in which the appellant had failed to preserve a <u>Blakely/Booker</u> objection in the district court, and the Supreme Court decided <u>Booker</u> while the appellant's sentence was pending on direct appeal.  Applying plain error review, we determined that the appellant had satisfied the first prong of the plain error test by showing error because, under a mandatory guideline system, the appellant's sentence had been enhanced as a result of judicially determined facts that went beyond the facts admitted by the defendant or found by the jury.  See <u>Rodriguez</u>, 398 F.3d at 1298.  In addition, we determined that the second prong of plain error had been met because, although the <u>Booker</u> error was not "plain" at the time of the appellant's sentencing hearing,

13

"where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that the error be 'plain' at the time of appellate consideration." Id. at 1299 (internal quotation and citation omitted). We, however, ultimately concluded that no reversible plain error had occurred because, under the third prong of plain error review, the appellant had failed to show that the Booker error "affect[ed] substantial rights," id. at 1299, as the record "provide[d] no reason to believe any result [was] more likely than the other." Id. at 1301.

Here, Perdue has failed to show that there is a reasonable probability that the district court's error, in light of Blakely and Booker, affected the outcome of his sentence. We conclude that no reversible plain error occurred and affirm Perdue's sentence.

## III. CONCLUSION

Potts and Perdue appeal their convictions for conspiracy to distribute and possess with intent to distribute cocaine powder and crack cocaine and argue that there was insufficient evidence to convict, that the district court erred by allowing testimony of drug transactions before the alleged conspiracy, and that the district court committed plain error under Blakely/Booker during sentencing. Upon

careful review of the record on appeal, and upon consideration of the parties'

briefs, we discern no reversible error.  We **AFFIRM**.