[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11966
Non-Argument Calendar
_____

D.C. Docket No. 9:12-cr-80220-DTKH-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRANDON BIVINS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 24, 2014)

Before TJOFLAT, HULL and JORDAN, Circuit Judges.

PER CURIAM:

After a jury trial, defendant-appellant Brandon Bivins appeals his conviction and sentence for possessing a firearm and ammunition after being convicted of a felony, in violation of 18 U.S.C. § 922(g).  After careful review, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

### A.    The Broward County Sheriff's Office's Gambling Investigation

In May 2011, officers of the Broward County Sherriff's Office (the "Broward officers") received information from a confidential informant ("CI") about an illegal sports betting operation in a sporting goods store in Lauderdale Lakes, Florida.  A second CI informed the officers that a person named "Coach B," later identified as defendant Bivins, was the "key figure" in a gambling operation associated with the South Florida Youth Football League.  Defendant Bivins was the president and coach of a team in that youth football league.  Coaches and league officials placed bets of as much as $100,000 on youth football games.

The officers later learned that defendant Bivins and others moved their gambling operations from the sporting goods store to a barbershop in Lauderhill, Florida.  Between June 2011 and October 2012, undercover detectives and CIs went to the barbershop in Lauderhill and, while in defendant Bivins's presence, placed bets on professional sporting events.

### B.    The Identification and Investigation of Bivins's Residence

2

The officers also investigated defendant Bivins's activities outside of the barbershop.  At least prior to May 2012, Bivins rented a house located at 10393 El Caballo Court in Delray, Florida (the "El Caballo residence"), which is in Palm Beach County.  The officers observed Bivins leave the house in the morning, drive to the barbershop in Lauderhill, and return to the El Caballo residence from the barbershop in the evening.

The Broward officers assisted by Agent Jonathan Wildove, from the Palm Beach County Sheriff's Office, conducted three trash-pulls from the El Caballo residence.

During the first trash-pull, on September 5, 2012, the officers found: (1) an HP Photosmart printer box; (2) a "hand[]written score sheet"; (3) an "Accord Certificate of Liability Insurance for the Fort Lauderdale Hurricanes," the youth football team of which Bivins was said to be the president and coach; and (4) "school documents for Tyren Bivins," which were addressed to Bivins at the El Caballo residence.  One week later, in a September 12 trash-pull, the officers found: (1) mail addressed to Bivins, albeit at an address other than the El Caballo residence; (2) "Bank of America documents addressed to the Fort Lauderdale Hurricanes," also sent to a different address; (3) mail addressed to the barbershop;

(4) gambling documents like wager tally sheets, payout documents, and betting receipts; and (5) a "[f]inancial [r]eport for the Florida Youth Football League."[1]

In the third trash-pull on October 10, the officers found: (1) "several gambling/wager documents . . . which were itemized by player"; (2) "several [w]ager [s]ummary [r]eports itemized by bet type"; (3) "several payout betting receipts titled West Palm Beach Fantasy League"; (4) "figure sheets"; and (5) "banking documents."

## C.     The Search Warrant for the El Caballo Residence

In light of this evidence, Agent Wildove and Broward Detective Solomon Barnes applied for a warrant to search the El Caballo residence and submitted a probable cause affidavit (the "warrant affidavit").  Wildove and Barnes averred that they had probable cause to believe that the El Caballo residence contained "property . . . therein that has been used to commit any crime, or constitute[d] evidence relevant to proving that a crime has been committed."  They stated the El Caballo residence was "the premises of, or occupied by, or under the control of: Brandon D. Bivins, black male born on March 19, 1976."

The officers listed two crimes: (1) bookmaking, see Fla. Stat. § 849.25; and (2) keeping a gambling house, see Fla. Stat. § 849.01.  They had probable cause to

---

[1]Defendant Bivins later informed the district court, and the government did not dispute, that the address on the mail to Bivins and on the bank documents was 4297 Southwest 34th Terrace, Fort Lauderdale, Florida.

believe these types of evidence were in the El Caballo residence: (1) "[a]ny and all U.S. Currency . . . and financial records"; (2) "[a]ny and all records of individual wagering accounts of bettors"; and (3) "[a]ny and all computer[]s."

The officers detailed information about their investigation of the gambling operation as "facts establishing [their] basis for probable cause." They acknowledged that the investigation began in May 2011 and stated: "[d]uring the month of May 2011, the Broward County Sheriff's Office Money Laundering Task Force (MLTF) received information from a reliable confidential source . . . that an ongoing illegal gambling operation related to sports betting, was operating at a location in the city of Lauderdale Lakes, Florida." The officers explained the second CI's role, stating: "[i]nformation received from another confidential informant utilized by the Broward [County] Sheriff's Office who has proven to be reliable advised the key figure in the gambling operation with the South Florida Youth Football League was 'Coach B' of the Fort Lauderdale Hurricanes." The officers described each piece of evidence recovered during the three trash-pulls.

On October 19, a state magistrate judge found probable cause and issued a warrant to search the El Caballo residence.

### D. The Search of the El Caballo Residence

On October 29, officers executed the search warrant at the El Caballo residence. A few hours earlier, they arrested Bivins on an arrest warrant.

5

During the search, the officers found, <u>inter alia</u>: (1) a fully loaded Ruger .357 double action revolver lying underneath a pile of dirty and clean clothing on the floor of a closet adjacent to the master bedroom; (2) a box containing approximately 20 rounds of .357 Magnum bullets in the kitchen pantry; (3) $19,000 in U.S. currency lying on an otherwise-empty bookshelf located in the middle of the garage; and (4) a bag containing various documents, including a color copy of Bivins's Florida driver's license and a Florida application for a Class G firearms license bearing Bivins's name, both located in a second closet adjacent to the master bedroom.

A federal grand jury indicted Bivins of knowingly possessing a firearm and one or more rounds of ammunition on October 29, 2012, after previously being convicted of a felony in violation of 18 U.S.C. § 922(g). Bivins pleaded not guilty.[2]

## E.    Bivins's Suppression Motion

Prior to trial, defendant Bivins filed a motion to suppress all evidence seized during the October 29 search. Relying on <u>Franks v. Delaware</u>, 438 U.S. 154, 98 S. Ct. 2674 (1978), Bivins argued that the search violated the Fourth Amendment

---

[2]Thereafter, the grand jury returned a superseding indictment, adding a second count which alleged that Bivins also had violated § 922(g) by possessing a firearm on May 8, 2012. Bivins pleaded not guilty to both counts in the superseding indictment. However, before trial, the government moved to voluntarily dismiss this second count, and the district court granted the motion.

because the warrant affidavit contained intentional, material omissions and, had the officers included the omitted facts, probable cause would be lacking.

The district court heard oral arguments on Bivins's suppression motion.[3] Bivins's attorney did not dispute the truthfulness of the statements contained in the warrant affidavit.  Rather, Bivins's attorney argued that the officers omitted two types of facts from the warrant affidavit—facts about the CIs and the three trash-pulls.

As to the CIs, Bivins's attorney argued that the warrant affidavit did not include facts allowing the magistrate judge to assess the CIs' credibility.  As to the trash-pulls, Bivins's attorney contended that the warrant affidavit failed to disclose that: (1) the mail to the youth football team was not addressed to the El Caballo residence; (2) Tyren Bivins, whose school records (addressed to the El Caballo residence) were recovered, was Bivins's son; (3) the mail addressed to Bivins also was not addressed to the El Caballo residence; and (4) the mail addressed to the barbershop was actually addressed to "Felicia Bivins."[4]  Bivins's attorney argued that, if the officers had included these additional facts, it would have been apparent that there was only a tenuous connection between Bivins and the property to be

---

[3]This hearing was not an evidentiary hearing under <u>Franks</u>.  The district court only heard argument on the suppression motion.

[4]"Felicia Bivins" was apparently Bivins's girlfriend, Felicia Roberts.

7

searched, calling into question the magistrate judge's probable cause determination.

The district court orally denied Bivins's motion to suppress. The district court concluded that it was "not only irrelevant but immaterial that the affidavit in support of the search warrant neglected to point out that the mail that was retrieved from a trash pull at the home to be searched had been addressed to another location." According to the district court, the central question was whether "[t]he information or the contents that were found . . . would . . . lead a reasonable person to conclude . . . that it's evidence of that crime and that more evidence of a crime would be found inside the home." The district court found that the answers to these questions were "clearly, yes."

## F.    Bivins's Motion in Limine as to Gambling Investigation

The case proceeded to trial. Bivins's attorney made a motion in limine to exclude evidence about the gambling investigation (which had led to the search) as inadmissible under Rule 403 of the Federal Rules of Evidence. He argued that the jury did not "need to know what [the officers] were investigating, just that there was a warrant issued by a judge and it was executed."

The government responded that the presence of the firearm and Bivins's alleged gambling activity were "inextricably intertwined with one another," as evidence regarding Bivins's gambling operation was evidence of Bivins's motive

for possessing a firearm.  The government's theory, in light of the $19,000 in U.S. currency found in the garage, was that "the firearm was there to protect the proceeds of the gambling activity."[5]

The district court denied Bivins's motion in limine, concluding that the evidence of gambling activity was in fact inextricably intertwined with the firearm crime.  The district court explained that "the presence of a large amount of money in cash and the allegation that it represents the proceeds of illegal activity would allow a reasonable trier of fact to conclude that one might well arm himself to be able to protect that money."

## G.    Trial

During the four-day trial, the gambling investigation was mentioned in the attorneys' statements and briefly in four witnesses' testimony.

In their opening statements, the prosecutor and Bivins's attorney mentioned the gambling investigation.  The prosecutor stated that the evidence would "go and show October 29th, 2012, agents of the Broward County Sheriff's Office, together with Palm Beach County Sheriff's Deputies [were] executing a search warrant for gambling at an address of 10393 El Cabillo [sic] Court."  He explained that: (1) "the agents were looking for records of gambling" in the "million dollar mansion";

---

[5]In the alternative, the government argued that the gambling-investigation evidence was admissible extrinsic evidence under Rule 404(b) of the Federal Rules of Evidence.  The district court rejected this alternative argument because the government did not give adequate notice of its intent to use extrinsic evidence as required by Rule 404(b).

and (2) after obtaining a search warrant for gambling, the agents "discovered in the bedroom, [a] loaded .357 Magnum Ruger revolver sitting in a pile of the Defendant's clothes, one of the rooms he maintained next to the master bed."

Bivins's attorney advised the jury: "Whether [Bivins] was being investigated or this property was being investigated for gambling is irrelevant."

Four government witnesses mentioned the gambling investigation.  First, Detective Gonzalo Gandarillas testified that on October 29, he followed Bivins when Bivins left the El Caballo residence, he assisted in arresting Bivins, and he was "assisting Detective Solomon Barnes in connection with a gambling operation."  Likewise, Detective Richard Olson testified that he assisted in the execution of the search warrant at El Caballo Court and they were looking for any documents and moneys in a gambling investigation.

During Bivins's attorney's cross-examination, Detective Wildove, who signed the warrant affidavit, affirmed that he assisted Detective Barnes in investigating Bivins.  Bivins's attorney asked Detective Wildove: "[a]nd in assisting Agent Barnes, that was in regards to a gambling investigation?" Detective Wildove answered: "Yes."  Bivins's attorney also asked him if "the purpose of the affidavit was to search the residence to look for evidence of gambling or gambling operation?"  Detective Wildove answered affirmatively.

10

Bivins's attorney also asked Detective Wildove: "In that application, you are indicating a litany, a list of things, substantial list of things that you think may indicate a gambling operation may have been conducted either by Mr. Bivins or may be found in that residence . . . [a]nd . . . there wasn't a directive towards firearms or anything of that sort, correct?"  The government challenged the relevance of the question, but the district court overruled the objection.  The district court advised the jury that it "should not infer the fact that a search warrant was issued that anybody thought Mr. Bivins was in knowing possession of a firearm."  Detective Wildove acknowledged that he did not "indicate part of the purpose of the warrant was [to obtain] evidence of a firearm."

Detective Barnes also mentioned the gambling investigation.  The prosecutor asked him if he "determine[d] there was a business location connected to Mr. Bivins being used for gambling purposes?"  Detective Barnes said that there was.  Detective Barnes testified that there were "[a]ctually two businesses, one Showtime Sports and Red Carpet Cuts Barber Shop."

After Detective Barnes's statement, the district court interrupted the questioning and instructed the jury that there was no gambling charge or proof against defendant Bivins and that the gambling was discussed only to show why the police went to the house in the first place, as follows:

> Let me stop for a second now.  I want to come back to this because one of the cardinal principles in any trial . . . is that somebody is on

11

trial only for the charge in the indictment.  And the jury knows there is one charge in this case, and the charge is a charge, an allegation that Mr. Bivins having previously been convicted of a felony offense, that he knowingly possessed a gun and/or ammunition in and affecting interstate commerce . . . .

Now, there is no gambling charge present in this case.  We've talked about it because, clearly, the jury needed to know, number one, why did the police go to the house in the first place?

But, I want to be very clear . . . if the Detective talked about a business associated where there may have been a suspicion, all right.  Suspicion, no, there is no proof of gambling at this point . . . .

Mr. Bivins is not on trial for the charge of gambling.

The last mention of gambling came during the government's rebuttal closing argument.  The prosecutor stated that: "[t]here is only one person in the house who had an interest in the firearms and had the means and opportunity and ability to use the gun and he is seated right there, Brandon Bivins."  The prosecutor contended that the money found in the house had come from "the Red Carpet Haircut Barber Shop," which was "one of the two locations [law enforcement officers] were investigating for the gambling operation."

Shortly thereafter, the district court gave another limiting instruction that there was no proof of illegal gambling, as follows:

I want to come back to this again.

In our case, there is evidence there is cash in the home.  Okay.  Certainly, the jury may consider and make its own judgment call whether someone who has a lot of cash might want to have a gun to protect themselves and deter others from coming in.

12

That is a jury question.

I want to be very careful here.  There is a lot of talk about gambling, and we all understand that, but there has been no proof that there is illegal gambling.

After deliberations, the jury found defendant Bivins guilty of the one count of possessing a weapon and ammunition after being convicted of a felony, in violation of 18 U.S.C. § 922(g).

## H.    Sentencing

Bivins's presentence investigation report ("PSI") reported that Bivins had three prior felony convictions for violent felonies or serious drug offenses, and thus was subject to a fifteen-year mandatory minimum sentence under 18 U.S.C. § 924(e).  The three prior felony convictions were: (1) a 1994 state court conviction for aggravated assault; (2) a 1996 state court conviction for aggravated assault with a deadly weapon; and (3) 1997 state court convictions for possession of cocaine with intent to deliver/sell and possession of marijuana with intent to deliver/sell.

The PSI recommended an obstruction of justice enhancement because, during his trial, Bivins presented the testimony of his girlfriend, Felicia Roberts. Roberts testified that, in July or August 2012, at the instruction of Bivins's father, she moved the firearm from the kitchen pantry to the closet and never told Bivins

13

about doing so.  The PSI stated that Roberts's testimony was false and Bivins

knowingly presented perjurious testimony.

Bivins also was subject to the armed career criminal enhancement under

§ 4B1.4 of the guidelines, making his total offense level 33.  See U.S.S.G.

§ 4B1.4(a), (b)(3)(B).  With a criminal history category VI, Bivins's advisory

guidelines range was 235 to 293 months' imprisonment.  See U.S.S.G. Ch. 5, Pt. A

(sent'g table).

After ruling on objections and hearing from the parties, the district court

imposed a sentence of 235 months' imprisonment.  Bivins appealed.

## II.  DISCUSSION

### A.    Bivins's Motion to Suppress

On appeal, Bivins contends that the warrant affidavit contained

misstatements and omissions, invalidating the warrant and search and violating the

Fourth Amendment.[6]

The Fourth Amendment requires that "absent certain exceptions, police

obtain a warrant from a neutral and disinterested magistrate before embarking upon

a search."  Franks, 438 U.S. at 164, 98 S. Ct. at 2681.  A warrant must be

supported by a sworn affidavit containing information which "is believed or

---

[6]A district court's denial of a motion to suppress evidence raises a mixed question of law and fact, and we review the district court's factual findings for clear error and its application of law to those facts de novo.  United States v. Bautista-Silva, 567 F.3d 1266, 1271 (11th Cir. 2009).

14

appropriately accepted by the affiant as true." Id. at 165, 98 S. Ct. at 2681.  The warrant affidavit must "set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." Id.  "Affidavits supporting arrest warrants are presumptively valid." United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) (citing Franks, 438 U.S. at 154, 171, 98 S. Ct. at 2684).

Bivins points to these four omissions from the affidavit: (1) the lack of any statement describing the officers' basis for believing the CIs to be reliable; (2) the failure to state that Mr. Bivins's name did not appear on the insurance policy for the Fort Lauderdale Hurricanes youth football team recovered during the first trash-pull; (3) the failure to state how Tyren Bivins is related to defendant Bivins in the reference to the Tyren Bivins school documents recovered during the first trash-pull; and (4) the failure to state that the bank documents addressed to Bivins were addressed to him at a location other than the El Caballo residence (where they found the trash).

As to each alleged omission, Bivins has not carried his burden to show he was entitled to a Franks hearing as to the warrant affidavit.  First, Bivins does not point to any evidence suggesting that the officers acted deliberately or recklessly in making any omissions.  See Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997).  None of the claimed omitted information on its face is so clearly critical to

the probable cause determination that its omission created a presumption of recklessness. See Madiwale, 117 F.3d at 1327. Even if these facts had been included, the warrant affidavit would still have supported the probable cause determination.

Second, there was more than enough truthful information in the affidavit suggesting that evidence of illegal gambling would be found in the El Caballo residence and linking Bivins to that residence. The affidavit explained that officers: (1) had found various items associated with gambling in the trash outside the house; (2) observed Bivins leave and return to the residence; and (3) found mail addressed to Bivins in the trash-pulls, suggesting Bivins had brought his mail to the El Caballo residence, even if he had not received it there.

Furthermore, the affidavit did not purport to establish probable cause that Bivins conducted gambling activities in the house. Rather, the affidavit stated only that probable cause existed to believe that there was evidence of gambling activity to be found in the El Caballo residence. The facts in the warrant affidavit—with or without the alleged omitted information—supported this conclusion of probable cause. Accordingly, the district court did not err in denying the motion to suppress.

**B.    Bivins's Motion in Limine**

Next, Bivins argues that the district court improperly allowed evidence of Bivins's alleged gambling activities to be introduced during the trial.[7] Over the course of the four-day trial, the gambling evidence came up only three times during the attorneys' arguments and four times during all of the witnesses' testimony. Importantly, the jury never learned the details about the gambling operation the officers suspected Bivins of operating, including the fact that the investigation linked Bivins to large wagers on youth football games.

Evidence of "criminal activity other than the charged offense" is admissible and not subject to Rule 404(b)'s barrier to the admission of extrinsic evidence if it is: (1) "an uncharged offense which arose out of the same transaction or series of transactions as the charged offense"; (2) "necessary to complete the story of the crime"; or (3) "inextricably intertwined with the evidence regarding the charged offense." United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998) (internal quotation marks omitted). Evidence is "inextricably intertwined" to the charged offense if it is an integral and natural part of a witness's testimony regarding the charged offense. Id.

We cannot say that the district court clearly abused its discretion in determining that the evidence of the gambling investigation was inextricably

---

[7]We review a district court's evidentiary ruling for a clear abuse of discretion, keeping in mind that a district court "has broad discretion to determine the admissibility of evidence." United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998).

17

intertwined with the evidence regarding the firearm.  See United States v. Thomas, 242 F.3d 1028, 1032 (11th Cir. 2001) (holding in a § 922(g) case that evidence of a defendant's drug trafficking activities could be "relevant to proving that he knowingly possessed . . . weapons").

In Thomas, the district court admitted evidence that a CI had twice gone to the defendant's home and purchased crack cocaine before officers executed a search warrant of that residence and found one rifle in the closet and another in a truck parked in the driveway.  Id. at 1030–31.  This Court affirmed the § 922(g) conviction, explaining that "[t]he fact that Thomas was engaged in selling crack from his home is relevant evidence from which to infer that he knowingly possessed rifles found in the closet of that home and in his truck."  Id. at 1032–33; see also United States v. Troya, 733 F.3d 1125, 1130–32 (11th Cir. 2013) (providing that, in a case charging drug trafficking and firearms offenses, evidence of uncharged shooting and uncharged attempted home invasion was inextricably intertwined with the charged offenses because the shooting was done to protect the drug operation and the home invasion showed the defendant's method of obtaining drugs to sell).

Likewise here, the fact that Bivins was suspected of spearheading a gambling operation was relevant information from which the jury could infer that he knowingly possessed the revolver found in his closet.  This was particularly true

18

in light of the large amount of currency located in his garage.  As the district court pointed out, the gambling investigation evidence gave rise to a possible explanation of the source of the $19,000.[8]  A reasonable jury might consider it more likely that an individual would keep a firearm in his home to protect a large amount of currency if the jury suspected that the currency came from illegal conduct.

Even if the district court abused its discretion by admitting the evidence, any error was harmless.  See United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) ("An erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless.").  The district court gave two detailed limiting instructions, ensuring that the limited, vague references to the gambling investigation did not prejudice Bivins.  See United States v. McNair, 605 F.3d 1152, 1204–05 (11th Cir. 2010) (providing that district court's limiting instructions ensured that defendants were not prejudiced by admission of other bad acts evidence under Rule 404(b)).[9]

---

[8]No witness testified, and the government did not explicitly argue, that the currency came from the gambling operation.

[9]To the extent that Bivins argues on appeal that the gambling investigation should have been excluded under Rule 403 of the Federal Rules of Evidence, we reject that argument as well. As we explained, the evidence had some probative value and the possibility for undue prejudice was obviated by the district court's emphatic and repeated limiting instructions.

19

In addition, the evidence of Bivins's guilt of knowingly possessing the handgun after being convicted of a felony was overwhelming.  Bivins stipulated to the prior felony conviction.  The government's evidence showed the items were found in Bivins's rental home and Bivins had been in the home the day of the search.  The government also introduced a completed application for a Florida concealed weapons license bearing Bivins's name and other identifying information.

Bivins has not shown reversible error as to his motion in limine.

## C.    Bivins's Substantive Reasonableness Challenge to His Sentence

Bivins does not challenge his guidelines calculations, but Bivins does argue that his 235-month sentence was substantively unreasonable.  We review the substantive reasonableness of a sentence under a deferential abuse of discretion standard.  Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007).  A defendant challenging his sentence bears the burden of showing that the sentence is unreasonable in light of the record and the § 3553(a) factors.  United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).  Although this Court does not presume that a sentence within the guidelines range is reasonable, we ordinarily expect such a within-guidelines range sentence will be deemed reasonable.  United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008).

Here, Bivins has not shown his sentence was substantively unreasonable. His sentence was at the bottom of the guidelines range of 235 to 293 months' imprisonment, well below his statutory maximum sentence of life imprisonment. The factors that led the district court to this sentence were: (1) when Bivins received his first adult felony conviction, in 1994, he lost his right to possess a firearm, and yet "in 1995, a year later, he was arrested and . . . he pled guilty to the crime of carrying a concealed firearm"; (2) the seriousness of Bivins's prior convictions; (3) the need to "get[] the message home to Mr. Bivins that he just cannot possess a firearm"; and (4) the need to "send a message to the rest of the community that if you do possess a firearm and you've been previously convicted of a felony offense, then it's a very serious offense."  The district court also stated that it considered the other factors listed in 18 U.S.C. § 3553(a) and concluded that "a sentence within the advisory guidelines range would be sufficient, but not greater than necessary to achieve the goals that Congress has set forth."

In light of this record, we cannot say that Bivins has shown his sentence was substantively unreasonable.

### III.  CONCLUSION

For the reasons explained, we affirm Bivins's conviction and 235-month sentence.

**AFFIRMED.**

21