[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14599

_____

D.C. Docket No. 1:14-cr-20926-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RONEN NAHMANI,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 11, 2017)

Before MARCUS, JILL PRYOR and SILER,[*] Circuit Judges.

JILL PRYOR, Circuit Judge:

After a six-day trial, a jury convicted defendant Ronen Nahmani of one count of conspiring to possess with intent to distribute controlled substances and controlled substance analogues. The district court sentenced him to 240 months' imprisonment, the statutory maximum. On appeal, Nahmani challenges his conviction and sentence on numerous grounds.

Nahmani's challenges include whether: (1) the indictment was defective because it alleged Nahmani conspired to possess with intent to distribute controlled substances and controlled substance analogues but failed to identify the specific substances that were the object of the conspiracy; (2) evidence seized from his automobile should be suppressed on the basis that there was no probable cause at the time of the search to believe that he was engaged in illegal conduct; (3) cumulative errors warranted a new trial; (4) the district court erred in applying a 20 year, as opposed to one year, statutory maximum when the indictment explicitly alleged a conspiracy to possess with intent to distribute a controlled substance analogue; and (5) the district court clearly erred in finding that the most closely related substance referenced in the drug equivalency tables in the United States Sentencing Guidelines was THC, not marijuana. After careful consideration

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

and with the benefit of oral argument, we conclude that there was no reversible

error and thus affirm.

## I.    STATUTORY BACKGROUND

We begin with an overview of the law regarding controlled substances and

their analogues.  The Controlled Substances Act prohibits possession with intent to

distribute a controlled substance, as well as conspiring to possess with intent to

distribute a controlled substance.  21 U.S.C. §§ 841(a)(1), 846.  A controlled

substance is any drug or other substance listed in five schedules, I through V,

which were established by the Controlled Substances Act.[1]  *Id.* §§ 802(6), 812(a).

The maximum sentence for a controlled substance offense depends on which

schedule lists the controlled substance.  The maximum sentence for an offense

involving a schedule I substance generally is 20 years' imprisonment.[2]  *See id.*

§§ 841(b)(1)(C), 846.  In contrast, the maximum sentence for an offense involving

a schedule V substance is one year of imprisonment.  *Id.* § 841(b)(3).

The Controlled Substances Analogue Enforcement Act ("Analogue Act"),

21 U.S.C. §§ 802(32), 813, prohibits the possession with intent to distribute a

---

[1] The Attorney General has the authority to add or remove substances from the schedules by rule.  21 U.S.C. § 811(a).  The current schedules are set forth in the Code of Federal Regulations.  *See* 21 C.F.R. §§ 1308.11-1308.15.

[2] If the indictment alleges and the government proves to a jury that the quantity of drugs exceeded certain amounts, the maximum sentence of imprisonment increases to 40 years or life. *See* 21 U.S.C. § 841(b)(1)(A), (B); *United States v. Sanders*, 668 F.3d 1298, 1309 (11th Cir. 2012).  No such enhanced maximum sentence was imposed in this case.

3

controlled substance analogue, as well as conspiring to possess with intent to distribute a controlled substance analogue.  Congress passed the Analogue Act "to prevent underground chemists from altering illegal drugs in order to create new drugs that are similar to their precursors in effect but are not subject to the restrictions imposed on controlled substances."  *United States v. Klecker*, 348 F.3d 69, 70 (4th Cir. 2003).

> The Analogue Act defines a controlled substance analogue as a substance:
>
> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A).  We have not previously decided whether this definition should be read disjunctively, meaning a substance that satisfies any one of the three criteria qualifies as a controlled substance analogue, or conjunctively, meaning that a substance must (1) have a chemical structure substantially similar to a controlled substance in schedule I or II and (2) either a substantially similar effect on the central nervous system or be purported or intended to have such an

4

effect. *See United States v. Brown*, 415 F.3d 1257, 1261 (11th Cir. 2005). Here, the district court read the definition conjunctively, and neither party challenges this reading. Because Nahmani's challenge fails even under the conjunctive reading of the Analogue Act—which places a more demanding burden on the government— we assume for our purposes here that the district court's reading was correct.[3]

A substance that qualifies as a controlled substance analogue, when intended for human consumption, is treated as a schedule I controlled substance. 21 U.S.C. § 813. Accordingly, an offense involving a conspiracy to possess with intent to distribute a controlled substance analogue is generally punishable by up to 20 years' imprisonment.

## II.    FACTUAL BACKGROUND

### A.    The Indictment

A federal grand jury indicted Nahmani of one count of conspiring to possess with intent to distribute controlled substances and controlled substance analogues during the period from approximately April 1 through July 28, 2014. More specifically, the indictment provided that:

> From on or about April 1, 2014, the exact date being unknown
> to the Grand Jury, through on or about July 28, 2014 . . . Ronen
> Nahmani[] did knowingly and willfully combine, conspire,

---

[3] A number of our sister circuits have adopted a conjunctive reading of the definition. *See, e.g.*, *United States v. Makkar*, 810 F.3d 1139, 1146 (10th Cir. 2015); *Klecker*, 348 F.3d at 71; *United States v. Hodge*, 321 F.3d 429, 435-36 (3d Cir. 2003); *United States v. Washam*, 312 F.3d 926, 930 n.2 (8th Cir. 2002).

confederate, and agree with others known and unknown to the Grand Jury, to

      a.  possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

      b.  possess with intent to distribute controlled substance analogues as defined in Title 21, United States Code, Section 802(32)(A), knowing that the substances were intended for human consumption as provided in Title 21, United States Code, Section 813.

All in violation of Title 21, United States Code, Section 846.

The controlled substances involved in the conspiracy attributable to the defendant as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, include Schedule I controlled substances, that is, AB-FUBINACA, PB-22, and XLR11, in violation of Title 21, United States Code, Section 841(a)(1).

The controlled substance analogues involved in the conspiracy attributable to the defendant as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, include THJ-2201, 5-Chloro-UR-144, and 5-Bromo-UR-144, which are analogues of Schedule I controlled substances, in violation of Title 21, Untied States Code, Section 841(a)(1), 802(32)(A), and 813.

Indictment (Doc. 3).[4]  Nahmani raised no objection to the indictment prior to trial.

## B.    The Trial

During a six-day trial, the government presented evidence that Nahmani

operated a business importing synthetic cannabinoids[5] from China and Hong Kong

---

[4] Citations to "Doc." refer to numbered docket entries in the district court record in this case.

that he sold throughout the United States. The government presented to the jury testimony and evidence about its investigation of Nahmani, which showed that he acted essentially as a wholesale distributor for synthetic cannabinoids. In addition, the government introduced expert testimony to establish that the items seized from Nahmani included the chemicals listed in the indictment, and that three of these chemicals, which were not listed on the schedules at the time of the conspiracy—THJ-2201, 5-Bromo-UR-144, and 5-Chloro-UR-144—qualified as controlled substance analogues.

### 1.    Nahmani's Business[6]

Nahmani imported synthetic cannabinoids in powder form from suppliers in China and Hong Kong who shipped the substances to Nahmani by UPS and other international carriers. He paid these suppliers through wire transfers, which sometimes were sent by his brother, Israel Nahmani. At times, Nahmani discussed in emails with his suppliers the specific chemicals they were sending him, showing that he knew the chemicals included AB-Fubinaca and THJ-2201.[7]

---

[5] Synthetic cannabinoids are manmade chemicals that mimic the effect of THC, the psychoactive chemical in marijuana. These chemicals may be smoked with plant material or in e-cigarettes.

[6] We have set forth the facts viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's guilty verdict, as we are required to do. *See United States v. Boffil-Rivera*, 607 F.3d 736, 740 (11th Cir. 2010).

[7] At the time the foreign suppliers sent Nahmani AB-Fubinaca and THJ-2201, the substances were not listed on schedule I.

Nahmani operated as a wholesaler, selling to others around the country the synthetic cannabinoids in powder and smokeable forms.  He sold large quantities of synthetic cannabinoids in powder form, including more than 40 kilograms of powder to a single purchaser.  He also set up in a storage space a laboratory to turn the powder into consumable products that could be smoked with plant material or in e-cigarettes.  To create a smokeable product, Nahmani mixed the powder with liquid acetone and coated plant material with the mixture, which he packaged into small bags.  Nahmani also mixed the powder with tobacco gel to create a product to be smoked in e-cigarettes.

Nahmani marketed his products under a variety of names.  Some names, such as Scooby Snax and Mary Joy, conveyed that the products were related or similar to marijuana.  Nahmani labeled some of the products as "potpourri" or "not for human consumption," but the government presented testimony that the products were intended to be consumed and that these labels were included to avoid detection by the Food and Drug Administration.

Nahmani distributed the products with assistance from his brother, Israel.  Sometimes Nahmani or others would deliver the products in person.  Other times Nahmani or Israel would ship the products through UPS, using aliases to make it more difficult to tie the packages to them.

At trial, the government presented testimony from Kyle Hurley, who purchased large quantities of AB-Fubinaca in powder form from Nahmani for approximately a one-year period.[8]   In February 2014, Hurley asked Nahmani if AB-Fubinaca was banned, and Nahmani responded that the product was banned in Florida but not in other states.  In fact, though, AB-Fubinaca had been added to schedule I earlier that month.  The next month, Hurley arranged to sell his remaining supply of AB-Fubinaca, which consisted of plant material weighing more than one ton, to a prospective purchaser.  Preparing to sell his entire supply, Hurley contacted Nahmani to purchase more chemicals and began to negotiate a price.  The purchase was never completed, however, because Hurley was arrested when his prospective purchaser turned out to be a law enforcement officer.

## 2.    The Investigation

In spring 2014, the Drug Enforcement Agency (DEA) began to investigate Nahmani after receiving a tip from a confidential informant that Nahmani was selling "spice"—synthetic cannabinoids.  In the investigation, the officers observed Nahmani selling spice.  After the informant told the DEA that Nahmani planned to sell spice to a convenience store, law enforcement officers observed Nahmani drive into the store's parking lot.  From his car, Nahmani briefly spoke to a man. Then, the officers saw Nahmani drive out of the convenience store parking lot to

---

[8] Nahmani's sales to Hurley occurred before the conspiracy period began.

another parking lot across the street where he met with the same man for a few minutes. At the end of the meeting, the man took a box from Nahmani's car and returned with it to the convenience store. An undercover officer entered the store and observed the man removing vials of liquid from the box and placing them in a display case. The man told the officer that the liquid in the vials was for smoking. Other officers followed Nahmani; they watched him go to a storage facility. About ten minutes later, Nahmani drove away from the storage facility. The officers witnessed Nahmani make multiple u-turns, possibly in an attempt to evade surveillance.

A few weeks later, the informant reported to the DEA that he was accompanying Nahmani on a road trip so that Nahmani could collect money for a previous spice transaction. During the trip, the informant reported to the DEA that Nahmani had received a phone call and then directed Israel to ship a package from a local UPS store. Based on this tip, the DEA alerted UPS, which found a powder substance inside the package.[9]

While Nahmani was driving back from collecting the money, the DEA contacted a local law enforcement officer to watch for Nahmani, who would be traveling with a large amount of currency. The officer followed Nahmani in an

---

[9] When Nahmani learned from a UPS employee that the package had been seized, he asked the employee whether there was any way to change the shipping information on the receipt of the seized package.

unmarked vehicle and saw him speeding.  The officer pulled Nahmani over for violating the traffic laws and then searched the vehicle.  Inside the vehicle, the officer found cash, business records, and packages containing a green, leafy substance.

When DEA agents arrived on the scene, they informed Nahmani that they had a warrant to search his storage space.  Nahmani agreed to go to the DEA agents' office.  During the drive to the office, Nahmani asked if he could call his wife.  The agents permitted the call but instructed Nahmani not tell his wife that he was with the DEA.  Nahmani nonetheless immediately told his wife that he was with the DEA, which caused the DEA to send other officers to Nahmani's home.

The officers arrived to find Israel removing boxes from Nahmani's apartment and loading them into Israel's vehicle.  Israel allowed the officers to search the car where they found several boxes containing chemicals.  Israel also admitted to the officers that he had additional chemicals at his house.

When law enforcement searched Nahmani's storage space under the warrant, they found materials used to manufacture synthetic cannabinoids, including kilograms of powder chemicals and bales of plant material, as well as packaging supplies and labels.[10]

---

[10] Before trial, Nahmani sought to suppress the evidence that was found in the searches of his vehicle and storage space; the district court denied these motions.

### 3.    The Substances at Issue

At trial, the government also presented scientific evidence about the powder and plants it had seized from Nahmani.  A government witness testified that chemical testing showed the powder and plants seized from Nahmani contained the chemicals AB-Fubinaca, PB-22, XLR-11, THJ-2201, and 5-Bromo-UR-144.[11]  At the time of the conspiracy alleged in the indictment, AB-Fubinaca, PB-22, and XLR-11 were listed as controlled substances on schedule I.

Because THJ-2201, 5-Bromo-UR-144, and 5-Chloro-UR-144 were not listed as controlled substances, the government had to prove that they qualified as controlled substance analogues.  To meet this burden, the government introduced expert testimony about these chemicals.  A DEA chemist testified that the chemical structure of each potential analogue was substantially similar to a controlled substance listed on schedule I.  Dr. Jordan Trecki, a DEA pharmacologist, testified that each substance had (or was likely to have) a substantially similar effect on the

[11] This government witness did not testify that any of the materials seized from Nahmani contained the chemical 5-Chloro-UR-144.  In its brief to this Court, the government explains that the witness apparently misspoke when identifying the chemical compounds in a particular sample.  The government asserts that the witness testified that the sample included XLR-11, 5-Fluoro-UR-144, and 5-Bromo-UR-11 when she meant to state that the sample included XLR-11, 5-Chloro-UR-144, and 5-Bromo-UR-11.  To show that the witness misspoke, the government points out that other testimony established that XLR-11 and 5-Fluoro-UR-144 were alternate names for the same chemical and that the underlying laboratory report, which was produced to Nahmani in discovery, reflected that the chemicals in the sample included XLR-11, 5-Chloro-UR-144, and 5-Bromo-UR-144.  Nahmani does not challenge on appeal that the witness misspoke or argue on the basis of this misstatement that the government failed to prove that 5-Chloro-UR-144 was a substance that he conspired to possess with intent to distribute.  Because Nahmani raises no challenge based on the witness's apparent misstatement, we need not discuss it further.

12

central nervous system as a controlled substance listed on schedule I.  His opinion was based on his analysis of the chemical structure of the substances; *in vitro* testing, which showed the attraction each drug had to a molecular receptor for cannabinoids; *in vivo* testing in rodents, which showed the efficacy or potency of the substances; and case reports that contained accounts from physicians about substances' effect on individuals who had consumed them.  Trecki testified that these methods were accepted ways to determine the effect a chemical would have on the human central nervous system.  He explained there were no scientific studies using humans to determine the effect of the substances on the human central nervous system because scientists ethically could not run a trial on humans for a drug with no known benefits that had potentially serious adverse effects.

### 4.    Closing Arguments and Jury Instructions

In closing arguments, Nahmani's counsel argued to the jury that the government had failed to carry its burden to prove that the plants and powder seized from Nahmani in fact contained AB-Fubinaca, PB-22, XLR-11, THJ-2201, 5-Bromo-UR-144, and 5-Chloro-UR-144 because the government's process for collecting and testing samples was unreliable.  In response, the government argued that its witnesses had provided two days of testimony describing the testing that confirmed the identity of the substances, expressing disbelief that Nahmani was challenging the identity of the substances after that extensive testimony and

13

Nahmani's failure to present any expert evidence of his own establishing that the substances were something else.

The court then instructed the jury. The jury instructions described the knowledge element for conspiracy to possess with intent to distribute a controlled substance and a controlled substance analogue. For the controlled substance conspiracy, the government had to prove that the defendant knew the conspiracy involved some controlled substance. For the analogue-to-a-controlled-substance conspiracy, the government had to prove, through circumstantial or direct evidence, that the defendant knew the conspiracy involved a substance (1) with a chemical structure was structurally similar to a controlled substance or (2) that had a stimulant, depressant, or hallucinogenic effect on the central nervous system that was substantially similar to or greater than the effect of a controlled substance in schedule I or II.

During deliberations, the jury sent a note asking, "Does the defendant have to be in possession of all three substances mentioned in the indictment or is one enough? In regards to the controlled substance analogues, does the defendant have to be in possession of all three substances mentioned in the indictment or is one enough?" In response to the jury's questions, the district court explained that because Nahmani was charged with conspiracy, not possession, he did not have to possess anything. The court also reminded the jury that it was to consider the

14

court's previous instructions as a whole.  And the court repeated to the jury its instruction regarding conspiracy to possess with intent to distribute a controlled substance.  The district court explained that the knowledge requirement could be met by showing that the defendant knew "that the conspiracy involved some controlled substance."  Trial Tr. at 70 (Doc. 173).  But the court did not repeat its explanation of the knowledge required for conspiracy to possess with intent to distribute a controlled substance analogue.  Instead, it simply stated that the "instruction is the same for conspiracy with respect to controlled substance analogues."  *Id.* at 71.

The jury returned a verdict finding that Nahmani had engaged in a conspiracy to possess with intent to distribute both a controlled substance and a controlled substance analogue.  The verdict form did not require the jury to specify the amount or substances involved in the conspiracy.

## C.    Post-Trial Motions

After the guilty verdict, Nahmani filed several post-trial motions.  First, he filed a motion for judgment of acquittal and a new trial, contending that the jury's verdict was not supported by substantial evidence and that the district court had erred in admitting certain testimony, refusing to suppress evidence, and improperly instructing the jury.  Second, Nahmani filed a motion to dismiss the indictment, arguing that the indictment was defective because it failed to identify the specific

substances that were the object of the conspiracy.  He further argued that because the indictment failed to identify the substances that were the object of the conspiracy, the court had to assume that the object of the conspiracy was a schedule V substance, making the statutory maximum sentence only one year.  The district court denied the motions.

**D.    Sentencing**

Before Nahmani's sentencing, the probation office issued a presentence investigation report ("PSR").  In calculating Nahmani's base offense level under the Sentencing Guidelines, the PSR found that Nahmani was responsible for a total of 1,200 kilograms of a mixture or substance containing a detectible amount of synthetic marijuana.  This total included (1) 1,100 kilograms of plant material that Hurley tried to sell to an undercover officer in late March 2014, (2) 40 kilograms of powder seized from Nahmani in July 2014, and (3) 60 kilograms of powder that Nahmani had ordered from China from late 2012 through early 2014.

Because the Sentencing Guidelines set forth no marijuana equivalence ratio for any of the synthetic cannabinoids in this case, the PSR calculated the base offense level using the marijuana equivalency of the most closely related controlled substance in the Guidelines' equivalency table.  *See* U.S.S.G. § 2D1.1, cmt. n.6.  The PSR found that THC was the most closely related controlled substance in the table and applied a conversion ratio of 1 gram of synthetic

cannabinoids to 167 grams of marijuana.[12]  U.S.S.G. § 2D1.1, cmt. n.8(D).  The

1,200 kilograms of a mixture containing a detectable amount of synthetic

cannabinoids thus converted to 200,400 kilograms of marijuana.[13]  The PSR

calculated Nahmani's base offense level as 38, the level applicable to any offense

involving 90,000 kilograms or more of marijuana.  The PSR then applied a two-

level increase because Nahmani maintained a premises for the purpose of

manufacturing or distributing a controlled substance and a four-level increase

because Nahmani was an organizer or leader of criminal activity that involved five

or more participants or was otherwise extensive.  *See* U.S.S.G. §§ 2D1.1(b)(12),

3B1.1(a).  Under the Guidelines, Nahmani's offense level and criminal history

category of I resulted in a term of life imprisonment, which the PSR reduced to the

statutory maximum of 240 months' imprisonment.

Before sentencing, Nahmani filed written objections to the PSR, raising

several arguments including that (1) marijuana, not THC, was the most closely

related substance in the Guidelines' drug equivalency table; (2) the PSR should not

have included the weight of the plant material in calculating the total weight of

drugs seized from Hurley; and (3) Nahmani was ineligible for the enhancement for

---

[12] The PSR applied this conversion ratio with respect to both the powder and plant material.

[13] Put another way, Nahmani was held responsible for the equivalent of more than 220 tons of marijuana.

an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

At the sentencing hearing, the government and Nahmani presented evidence about whether the synthetic cannabinoids at issue were most closely related to THC or marijuana. Trecki, the DEA pharmacologist, again testified for the government, explaining that the substances were more similar to THC than marijuana. He identified two key differences between marijuana and synthetic cannabinoids. First, he explained that although marijuana contains THC, marijuana plants contain other naturally occurring chemicals that mediate and reduce the effects of THC. But the synthetic cannabinoids here, whether in powder or plant form, contained no such moderating chemicals. Second, he described the severe adverse effects of the synthetic cannabinoids that were not seen after the ingestion of marijuana, like loss of consciousness, psychomotor agitation, hallucinations, and seizures.

Trecki also explained that the synthetic cannabinoids had hallucinogenic effects on the central nervous system that were substantially similar or likely to be substantial similar to THC. He offered this opinion based on his analysis of the chemical structure of the substances; *in vitro* testing, which showed the substances' attraction to a molecular receptor; and *in vivo* testing in rodents, which showed the

efficacy or potency of the substances. He opined that most of the synthetic cannabinoids at issue were at least as potent as THC.[14]

In response, Nahmani presented testimony from his expert—Dr. Daniel Buffington, a pharmacologist—challenging Trecki's opinions. Buffington criticized Trecki for offering an opinion on the effect of synthetic cannabinoids on the human central nervous system without human studies. Because there were no studies showing the effects of these cannabinoids on humans, Buffington stated that the appropriate equivalency ratio should be 1:1, not 1:167.

After considering this evidence, the district court found Nahmani responsible for a total weight of 1,200 kilograms of synthetic cannabinoids. The district court found that THC was the most closely related substance and applied a 1:167 marijuana equivalence ratio. The district court further found that Nahmani was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive and applied the enhancement. Because the sentencing range under the Guidelines was 360 months to life, which exceeded the statutory maximum, the court reduced the range to the statutory maximum of 240 months. After considering the factors set forth in 18 U.S.C. § 3553(a), the district

---

[14] Trecki offered no opinion about whether 5-Bromo-UR-144 and 5-Chloro-UR-144 were at least as potent as THC because there had been no *in vivo* testing involving the substances from which he could draw conclusions about their potency.

19

court sentenced Nahmani to 240 months' imprisonment to be followed by three years of supervised release. This is Nahmani's appeal.

## III.  LEGAL ANALYSIS

### A.  The District Court Properly Denied Nahmani's Motion to Dismiss the Indictment.

Nahmani argues that the district court should have dismissed the indictment because the indictment had a jurisdictional defect in failing to identify the specific controlled substance or controlled substance analogues that were the object of the conspiracy.[15] To begin, we must identify the relevant standard of review. Nahmani claims that we must apply *de novo* review because his challenge is jurisdictional. *See United States v. Sperrazza*, 804 F.3d 1113, 1119 (11th Cir. 2015). But if the challenge is non-jurisdictional, we must review for plain error unless Nahmani can show that the basis for his motion was not "reasonably available" before trial or could not have been "determined without a trial on the merits." *Id.* (internal quotation marks omitted).

We conclude that Nahmani raises a non-jurisdictional challenge to the indictment and so plain error review applies. We have explained that "an omission of an element from an indictment does not deprive the district court of

---

[15] Although a latter portion of the indictment identified the substances "involved in" the conspiracy, the parties agree that the portion of the indictment setting forth the substantive criminal offense alleged a generic conspiracy because it failed to identify the specific substances that were the object of the conspiracy.

20

jurisdiction." *United States v. Brown*, 752 F.3d 1344, 1351 (11th Cir. 2014).[16]

Nahmani argues that the indictment was defective because it omitted an element of

offense; his challenge thus is non-jurisdictional. Nahmani failed to challenge the

indictment prior to trial or show that the basis of his motion was unavailable prior

to trial,[17] and therefore we review for plain error. *See Sperrazza*, 804 F.3d at 1119.

There was no error, let alone plain error, here. Nahmani asserts that the

indictment was defective because it failed to identify the specific controlled

substances and controlled substance analogues that were the object of the

conspiracy to possess with intent to distribute. But our precedent recognizes that

an indictment may charge a generic conspiracy to possess with intent to distribute a

controlled substance and need not identify the specific drug that was the object of

the conspiracy. *See United States v. Sanders*, 668 F.3d 1298, 1311 (11th Cir.

2012) (explaining that an indictment may charge "a generic violation of §§ 841(a)

and 846 in which [the defendant] conspired to knowingly and intentionally

---

[16] By contrast, we have explained that an indictment contains a jurisdictional defect when (1) "the Government affirmatively alleged a specific course of conduct that is outside the reach of the [] statute"; (2) the indictment alleged "conduct that was not a crime against the laws of the United States," such as charging a conspiracy to attempt to import marijuana when there was no such crime in the United States Code; or (3) the indictment alleged the defendant violated a regulation that carried only civil penalties and did not impose criminal liability. *Brown*, 752 F.3d at 1352-53.

[17] Nahmani argues that he could not bring the motion prior to trial because the full extent of the prejudice he experienced was not revealed until trial when the government constructively amended the indictment by making his lawful dealing with Hurley the focus of the trial. We are unpersuaded. After all, Nahmani's argument that the indictment failed to allege an element of the offense is based on the face of the indictment, which was available to him before trial.

distribute 'a controlled substance'"). We reject Nahmani's argument that the indictment was insufficient.

Nahmani relies on our decision in *United States v. Narog*, 372 F.3d 1243 (11th Cir. 2004), to argue that an indictment must allege the drug involved in the conspiracy. His reliance on *Narog* is misplaced. In *Narog*, the indictment alleged that the defendants possessed pseudoephedrine knowing that it would be used to manufacture methamphetamine. *Id.* at 1246. Despite the indictment's specificity, the district court instructed that the jury need not find the defendants knew that the pseudoephedrine would be used to make methamphetamine specifically, as opposed to some other drug. *Id.* at 1247. We reversed the defendants' convictions because the district court's instruction constructively amended the indictment when it removed the requirement that the defendants had to know the pseudoephedrine would be used to make methamphetamine. *Id.* at 1248-49. *Narog* is unhelpful here because it did not address whether an indictment may allege a generic conspiracy involving controlled substances.

We conclude that there was no defect in the indictment. The district court properly denied Nahmani's motion to dismiss.

## B.    The District Court Properly Denied Nahmani's Motion to Suppress.

Nahmani next challenges the district court's denial of his motion to suppress the evidence found in the search of his vehicle. In reviewing a district court's

denial of a motion to suppress, we apply a mixed standard of review. *United States v. Boyce*, 351 F.3d 1102, 1105 (11th Cir. 2003). We review the district court's findings of fact for clear error and its application of the law to those facts *de novo*. *Id.* Additionally, we construe all facts in the light most favorable to the prevailing party, which in this case is the government. *Id.*

To evaluate the search, we must consider separately whether the initial stop and subsequent search of the vehicle each were lawful. On the first inquiry, we conclude that the officer validly stopped Nahmani. A police officer may stop a vehicle if he has "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles." *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) (internal quotation marks omitted). Here, the officer observed Nahmani speeding in violation of Florida law, *see* Fla. Stat. § 316.183(1), making the initial stop lawful.

Second, we determine that the warrantless search of the vehicle was justified under the automobile exception. Under the automobile exception, police may conduct a warrantless search of a vehicle "if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). Probable cause "exists when under the totality of the circumstances, there is a fair probability that contraband or evidence

23

of a crime will be found in the vehicle." *Id.* (internal quotation marks omitted).

Here, there is no question that Nahmani's vehicle was readily mobile. And there was probable cause, as there was a fair probability that his vehicle contained contraband or evidence of a crime. At the time of the stop, the confidential informant, who had provided law enforcement with reliable information in the past, had told law enforcement that Nahmani was traveling with the proceeds from a sale of spice.

Nahmani argues that the officer lacked probable cause because law enforcement had no basis for concluding that the spice he was selling was illegal. But even if the informant's tip that Nahmani was selling "spice" was insufficient alone to create probable cause that the substances were illegal, law enforcement's surveillance of Nahmani was sufficient to raise a fair probability that the substances were illegal. When Nahmani sold spice to the convenience store, he went to a nearby parking lot instead of the store's premises for the transaction. This conduct supports an inference that Nahmani was trying to hide the transaction because he knew the substance was illegal. And after Nahmani sold the spice to the convenience store, he went to the storage facility; upon leaving the storage facility, he made multiple u-turns in an apparent attempt to avoid being followed. This evasive driving supports the inference that Nahmani was trying to escape surveillance because he knew he was violating the law.

24

Despite this evidence, Nahmani argues that the officer lacked probable cause for the search because the spice he sold to the convenience store had not been tested to determine whether it contained illegal substances.  He relies for this argument on our decision in *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004).  In *Kingsland*, we explained that law enforcement may not turn "a blind eye to *immediately available* exculpatory information" when conducting an investigation.  *Id.* at 1229 n.10 (emphasis added).  But Nahmani has identified no immediately available information to which law enforcement turned a blind eye, so we conclude that *Kingsland* is inapplicable here.  The district court properly denied the motion to suppress the search of the vehicle because there was probable cause for the search and the automobile exception applied.[18]

## C.    There Was No Cumulative Error Requiring a New Trial.

Nahmani argues he is entitled to a new trial because of the cumulative effect of errors at trial—including, but not limited to, the district court's erroneous

---

[18] Nahmani also argues that the district court erred when it declined to suppress evidence found in the search of the storage space.  Although law enforcement obtained a warrant for the search, Nahmani contends that the search was improper because the information in the warrant was insufficient to establish probable cause.  Again, Nahmani's argument is based on the assumption that law enforcement lacked sufficient information to conclude that the spice he was selling was illegal.  We disagree because as we explained above, law enforcement had a sufficient basis to conclude that the substances were illegal.  We further note that, because the confidential informant had told law enforcement that Nahmani kept his supply of spice in the storage space and law enforcement had observed Nahmani frequently visit the storage space, there was a "fair probability that contraband or evidence of a crime" would be found there. *United States v. Lebowitz*, 676 F.3d 1000, 1010-11 (11th Cir. 2012) (internal quotation marks omitted).  The district court thus properly denied Nahmani's motion to suppress the search of the storage space.

25

evidentiary rulings, the prosecutor's improper statement in closing arguments, and the district court's misleading response to a question from the jury—deprived him of a fair trial.  We disagree.

We review for abuse of discretion the district court's evidentiary rulings, overruling of Nahmani's objection to the closing argument, and response to the jury's questions.  *See United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011); *United States v. Lopez*, 590 F.3d 1238, 1247 (11th Cir. 2009); *United States v. Calderon*, 127 F.3d 1314, 1338 (11th Cir. 1997).  Even if a ruling was an abuse of discretion, "it will result in reversal only if the . . . error was not harmless." *Augustin*, 661 F.3d at 1123.  When a defendant raises an evidentiary challenge for the first time on appeal, we review for plain error.  *United States v. Eduoard*, 485 F.3d 1324, 1343 (11th Cir. 2007).  Under the plain error standard, there must be (1) error, (2) that is plain, (3) that affects the defendant's substantial rights, and (4) that seriously affected the fairness, integrity or public reputation of judicial proceedings.  *Id.* at 1343 n.7.  But even when an individual error alone is insufficient to warrant reversal, we must also consider the cumulative effect of the errors to determine whether the defendant was denied a fair trial.  *See Calderon*, 127 F.3d at 1333.

To review Nahmani's cumulative error argument, we must first assess whether Nahmani's individual claims of error are correct and then determine the

combined effect of any erroneous rulings.  We conclude that there is no reversible error here because Nahmani was afforded "a fundamentally fair trial."  *Id.*

### 1.     The District Court Did Not Abuse Its Discretion in Admitting Hurley's Testimony.

Nahmani argues that the district court erred in permitting Hurley to testify for the government.  He contends that the district court should have excluded Hurley's testimony because the testimony was (1) about conduct that occurred before the conspiracy period, (2) inadmissible character evidence that should have been excluded under Federal Rule of Evidence 404(b), and (3) included inadmissible hearsay about separate investigative findings and judicial proceedings.  We conclude that the district court did not abuse its discretion in permitting Hurley to testify.

First, Nahmani asserts that Hurley's testimony should have been excluded because it related to conduct that occurred before the conspiracy period alleged in the indictment.  By allowing Hurley to testify, Nahmani contends, the district court let the government constructively amend the indictment by changing the time period of the conspiracy.  Although Nahmani is correct that he last sold AB-Fubinaca to Hurley in late January or early February 2014, before the conspiracy period, the evidence showed that Nahmani also tried to sell synthetic cannabinoids to Hurley on March 28, which is "on or about April 1," as the indictment alleged.

27

Indictment (Doc. 3). Thus, we reject Nahmani's assertion that Hurley's testimony only covered acts that occurred outside the conspiracy period.[19]

Second, Nahmani argues that Hurley's testimony should have been excluded under Federal Rule of Evidence 404(b). Rule 404(b) prohibits the use of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character." Fed. R. Evid. 404(b). But evidence "pertaining to the chain of events explaining the context, motive and set-up of the crime[] is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (internal quotation marks omitted).

The district court properly admitted Hurley's testimony because it was intrinsic evidence that completed the story of Nahmani's crime. Hurley's testimony showed that Nahmani knew he was selling AB-Fubinaca and tried to sell Hurley AB-Fubinaca even after it was listed as a schedule I controlled substance. Hurley also testified that he paid Nahmani $100,000 in cash several times and that Nahmani directed him to send other payments to several bank accounts. This

---

[19] For similar reasons, we reject Nahmani's argument that Hurley's testimony was irrelevant because when Nahmani sold substances to Hurley, AB-Fubinaca was not listed as a controlled substance on schedule I. Even though all the completed transactions occurred before AB-Fubinaca was added to schedule I, the evidence shows that Nahmani tried to sell AB-Fubinaca to Hurley after the substance was listed as a schedule I compound in February 2014.

28

testimony showed that Nahmani was trying to conceal the transactions and supported an inference that he knew the spice that he was importing and selling was illegal. Because Hurley's testimony completed the story of the crime, we cannot say that Rule 404(b) required the district court to exclude it.

Third, Nahmani argues that Hurley should not have been permitted to testify about investigative or judicial findings—more specifically, that Hurley's testimony that he had pled guilty and the substances seized from him tested positive for AB-Fubinaca should have been excluded. But Hurley was permitted to disclose his guilty plea to the jury to blunt the attack on Hurley's credibility during cross-examination. *See United States v. DeLoach*, 34 F.3d 1001, 1004 (11th Cir. 1994).[20] And even assuming that permitting Hurley's testimony about testing performed by the government and by Hurley showing the substances seized contained AB-Fubinaca was error, any error was harmless given the other evidence that Nahmani sold Hurley AB-Fubinaca, including Hurley's testimony that Nahmani told him that the substance was AB-Fubinaca.

---

[20] Nahmani contends that the district court should have given an instruction to identify the limited purpose for which the jury could consider Hurley's guilty plea. But because Nahmani never requested such a limiting instruction, there can be no error. *See United States v. Miranda*, 197 F.3d 1357, 1360 (11th Cir. 1999) ("The failure to give a limiting instruction is error only when such an instruction is requested.").

**2.    The District Court Did Not Abuse Its Discretion in Admitting Trecki's Expert Testimony.**

Next, Nahmani argues that the district court erred when it admitted expert testimony from Trecki about the effect that the three alleged analogues, THJ-2201, 5-Bromo-UR-144, and 5-Chloro-UR-144, have on the human central nervous system. Nahmani contends that Trecki's opinions should have been excluded as unreliable because they were not based on research performed on humans. We discern no abuse of discretion.

Under Federal Rule of Evidence 702, a district court acts as a gatekeeper to keep out irrelevant or unreliable testimony. *See Daubert v. Merrell Dow*, 509 U.S. 579, 593 (1993). To evaluate the reliability of scientific expert testimony, a district court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. In *Daubert*, the Supreme Court identified the following factors as ones that could assist in determining whether an expert's methodology was sufficiently reliable: (1) whether it can and has been tested, (2) whether it has been subjected to peer review and publication, (3) what its known or potential rate of error is, and (4) whether it is generally accepted in the field. *Id.* at 593-94. Because the inquiry is flexible, "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible." *Brown*, 415 F.3d at 1268.

30

We have emphasized that the district court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (internal quotation marks omitted).  After all, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof "are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (internal quotation marks omitted).

Here, Nahmani claims that Trecki's opinions were insufficiently reliable because they were not based on human testing.  But we cannot say that district court abused its discretion when it allowed Trecki to testify.  Trecki explained that his opinions about what effect the alleged analogues would have on the human central nervous system were based on the structure of the chemicals, *in vitro* testing, *in vivo* testing in rodents, and case reports.  Importantly, Trecki had testified that each method was a scientifically accepted way to determine what effect a drug would have on the human central nervous system.  Because Nahmani's objections go to the weight, not the admissibility, of Trecki's testimony, the district court acted within its discretion in allowing the expert to testify.[21]

---

[21] Nahmani also argues that the district court should have barred the government from cross examining his expert witness, Buffington, about a medical report showing that an infant

### 3. The District Court Did Not Abuse Its Discretion When Responding to a Jury Question.

Nahmani also argues that he should get a new trial because the district court gave a misleading answer to the jury's questions when the court failed to describe the knowledge required to convict Nahmani of conspiracy to possess with intent to distribute a controlled substance analogue.[22]  Viewing the instructions as a whole, though, we cannot say that the jury was misled.

---

died after ingesting a synthetic cannabinoid.  Nahmani has failed to show that the district court abused its discretion.

First, the testimony was relevant.  Buffington had testified that there was insufficient evidence about the effect synthetic cannabinoids on humans and specifically asserted that there was no human data on any synthetic cannabinoids.  To demonstrate that Buffington's assertion about the lack of human data was inaccurate, the prosecutor asked Buffington on cross examination if he was familiar with a *New England Journal of Medicine* article that discussed a case study in which a 10-month-old died after ingesting synthetic cannabinoids.  The question was relevant to refute Buffington's testimony that there was no human data about synthetic cannabinoids and to undermine his opinion there was insufficient evidence on the effect of synthetic cannabinoids on the human central nervous system.  *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")

Second, Nahmani failed to show that question was unfairly prejudicial.  A district court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  But this "extraordinary remedy . . . must be used sparingly because it results in the exclusion of concededly probative evidence."  *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1211 (11th Cir. 2009).  Accordingly, we have explained that evidence is properly excluded as unfairly prejudicial when it is "dragged in by the heels solely for prejudicial impact."  *Id.* (internal quotation marks omitted).  Here, the cross examination of Buffington was probative, as it was connected to whether it was possible to determine the effect of synthetic cannabinoids on the human central nervous system.  Because we cannot say that the evidence was presented solely for prejudicial impact, the district court did not err in allowing the cross examination.

[22] Nahmani also argues that the district court erred in denying his request to use a verdict form that would have required the jury to find the specific weight of each drug involved in the conspiracy.  But under Supreme Court precedent, a jury is required to find drug weights only when the government seeks to exceed the statutory maximum of 20 years for controlled

32

Although a district court has considerable discretion regarding supplemental jury instructions, it may not misstate the law or confuse the jury. *See Lopez*, 590 F.3d at 1247-48. We review a challenged supplemental jury instruction "as part of the entire jury charge, in light of the indictment, evidence presented[,] and argument of counsel to determine whether the jury was misled." *United States v. Johnson*, 139 F.3d 1359, 1366 (11th Cir. 1998) (internal quotation marks omitted). We will reverse the district court because of an erroneous instruction only "when we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Brown*, 590 F.3d at 1247. When the instructions as a whole accurately convey the applicable law, "there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." *United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir. 1996).

In its initial instructions to the jury, the district court properly explained the government's burden in establishing Nahmani's knowledge of the conspiracy. The court instructed that to convict Nahmani of conspiracy to possess with intent to distribute a controlled substance analogue, the jury had to find, among other things, that Nahmani knew that the purpose of the conspiracy was to possess with intent to

---

substance offenses. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury"). Because the government did not seek to exceed the statutory maximum here, no special verdict form was needed.

distribute analogues.  The government could prove that Nahmani knew the substances were analogues by proving through direct or circumstantial evidence that he knew that the substances either had (1) a chemical structure similar to a controlled substance or (2) a stimulant, depressant, or hallucinogenic effect on the central nervous system that was substantially similar to or greater than the effect of a controlled substance in schedule I or II.

In response to the jury's questions asking whether Nahmani had to possess the controlled substances and controlled substance analogues, the district court explained that because the charged offense was conspiracy, the government need not prove that Nahmani had possessed controlled substances or controlled substance analogues.  The district court also repeated to the jury a portion of its earlier instruction about conspiracy.  With respect to the conspiracy to possess with intent to distribute a controlled substance, the district court explained that Nahmani needed to know that the conspiracy involved a controlled substance.  But the district court did not repeat its earlier instruction about what knowledge Nahmani needed to have about the substances for the controlled substance analogue conspiracy.  Instead, the district court stated that the "instruction is the same for conspiracy with respect to controlled substance analogues."  Trial Tr. at 71 (Doc. 173).

34

Even if the supplemental instruction was technically imperfect, we cannot say that the jury was misled.  The jury's question was about whether, to convict, it had to find the Nahmani had possessed the substances.  The district court directly answered this question by stating that possession was not required.  To provide context, the district court repeated its initial instruction about conspiracy. Although the court omitted the instruction specific to knowledge about analogues, it reminded the jury to consider the supplemental instruction in connection with the earlier instructions.  Because "[t]he jury could refer to the initial jury instructions, which correctly stated the" knowledge requirement for the controlled substance analogue conspiracy offense, the district court did not abuse its discretion.  *United States v. Baston*, 818 F.3d 651, 662 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 850 (2017).

### 4.    There Was No Cumulative Error.

Having reviewed each error Nahmani argues, we conclude that there is no cumulative error.  At most, Nahmani has shown that the trial court erred in permitting Hurley to testify about the results of chemical testing showing the substances that were seized from him were AB-Fubinaca.  But as we explained above, any error was harmless, and Nahmani is not entitled to a new trial.

35

**D.    The Evidence Was Sufficient to Support Nahmani's Conviction.**

Nahmani next argues that we must reverse his conviction because there was insufficient evidence for a jury to find that he conspired with another person.  We disagree because there was sufficient circumstantial evidence for a jury to find that Nahmani agreed with his brother, Israel, to possess with intent to distribute controlled substances and controlled substance analogues.

We review *de novo* the district court's denial of a judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the government and drawing all reasonable inferences as well as credibility determinations in the government's favor.  *United States v. Capers*, 708 F.3d 1286, 1296-97 (11th Cir. 2013).  We may not overturn a jury's verdict "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *Id.* at 1297 (internal quotation marks omitted).

Here, the jury could have inferred from circumstantial evidence that Nahmani and Israel conspired.   To establish a conspiracy, "the government must prove (1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005) (internal quotation

36

marks omitted).  The government may rely on circumstantial evidence to prove the existence of such an agreement.  *Id.*

There was ample circumstantial evidence that Nahmani and Israel agreed to distribute illegal substances.  Nahmani does not challenge that there was ample evidence that he and Israel had agreed to work together, but he argues that Israel cannot qualify as a conspirator because Israel was unaware that the object of their agreement was to do an unlawful act.  But viewing the evidence in the light most favorable to the government, a jury could find that Israel was aware that he and Nahmani were distributing illegal substances.  This evidence included that Israel used an alias to ship a package containing powder at Nahmani's direction and went to Nahmani's house to remove chemicals that contained synthetic cannabinoids after Nahmani alerted his wife that he was with the DEA.  This is sufficient evidence to support Nahmani's conviction.

## E.    The District Court Did Not Err in Applying a 20-Year Statutory Maximum.

Nahmani also challenges his 20-year sentence, arguing that under the conspiracy charged in the indictment the maximum sentence of imprisonment he could receive was one year.  He claims that because the indictment alleged only a generic conspiracy to possess with intent to distribute controlled substances and controlled substance analogues, the indictment gave him no notice that schedule I substances were the object of the conspiracy.  In the absence of such notice,

37

Nahmani contends, he was subject to the one-year statutory maximum that applies to conspiracies involving schedule V substances.  We review *de novo* whether Nahmani's sentence exceeded the statutory maximum.  *See United States v. Mazarky*, 499 F.3d 1246, 1249 (11th Cir. 2007) ("We review *de novo* the legality of a sentence . . . ." (internal quotation marks omitted)).

Nahmani's position rests on the assumption that nothing in the indictment notified him that the substances involved in the conspiracy were controlled substances listed on schedule I or II and thus subject to a 20-year statutory maximum.  *See* 21 U.S.C. § 841(b)(1)(C).  Not so.  The indictment alleged that Nahmani conspired to possess with intent to distribute controlled substance analogues.  The Analogue Act makes clear that all controlled substance analogues are treated as schedule I substances.  *Id.* § 813 ("A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I."); *see McFadden v. United States*, 135 S. Ct. 2298, 2302 (2015).  The indictment therefore gave Nahmani notice that a 20-year statutory maximum applied, and the district court did not err in applying a 20-year statutory maximum sentence.

F.    **The District Court Did Not Err in Applying a 1:167 Equivalency Ratio for Purpose of Calculating the Relevant Weight of Drugs.**

Finally, Nahmani challenges the district court's calculation of his offense level under the Sentencing Guidelines, arguing that the district court improperly

38

calculated his base offense level.  He claims that in determining the equivalent

weight of marijuana the district court erred in finding that THC, not marijuana, was

the most closely related substance referenced in the Guidelines to the synthetic

cannabinoids and thus should not have applied the 1:167 equivalency ratio that

applies when the most closely related substance is THC.[23]  But we cannot say that

the district court's factual finding was clearly erroneous.

The synthetic cannabinoids at issue in this case do not appear in § 2D1.1 of

the Guidelines, which provides the base offense level for drug offenses.  When a

substance is not listed in § 2D1.1, the district court must "determine the base

offense level using the marihuana equivalency of the most closely related

---

[23] Nahmani also argues that the district court erred at sentencing by (1) including in the weight of drugs for which Nahmani was responsible the 1,100 kilograms of plant material seized from Hurley and (2) applying a four-level increase in offense level under § 3B1.1 of the Guidelines because Nahmani was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

First, even if the district court erred in attributing the weight of the plant material seized from Hurley to Nahmani in calculating his sentence, any error was harmless and does not warrant resentencing.  *See United States v. Mathenia*, 409 F.3d 1289, 1292 (11th Cir. 2005).  Resentencing is unnecessary because if the district court excluded the weight of the plant material seized from Hurley, the sentence calculated under the Guidelines would remain the same.  Nahmani did not challenge the portions of the PSR attributing to him 40 kilograms of powder seized from him in July 2014, 60 kilograms of powder that he ordered from China, and 150 kilograms of powder that he sold to Hurley.  Even if the district court had used 250 kilograms of a mixture containing synthetic cannabinoids as the relevant drug quantity, Nahmani's sentence would have remained the same.  His guideline range still would have been 360 months to life, and the statutory maximum of 240 months would have become his sentence.

Second, we cannot say that the district court erred in applying a four-level increase to the offense level because Nahmani was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.  *See* U.S.S.G. § 3B1.1.  The district court's finding that the criminal activity was extensive was not clearly erroneous given the evidence that Nahmani was acting as a wholesale distributor importing and selling large quantities of synthetic cannabinoid powder to suppliers across the country.

substance referenced in this guideline." U.S.S.G. § 2D1.1 cmt. n.6. Because the identification of the most closely related substance is a fact question, we review for clear error. *See United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009).

To identify the most closely related substance under the Guidelines, the district court must consider "to the extent practicable," the following three factors:

> (A) Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.
>
> (B) Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.
>
> (C) Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

U.S.S.G. § 2D1.1 cmt. n.6. The Guidelines explicitly provide that each factor must be considered only "to the extent practicable," so the district court need not consider a factor if there is no available evidence about it. *Id.*; *see United States v. Novak*, 841 F.3d 721, 730 (7th Cir. 2016) (concluding that absence of evidence about chemical structure meant that the court would consider only the two other factors); *United States v. Chowdhury*, 639 F.3d 583, 586 (2d Cir. 2011) (holding that district court's determination about the most similar controlled substance was

40

not clearly erroneous even in the absence of evidence about chemical structure and potency).

At sentencing, the government produced reliable and specific evidence, in the form of Trecki's testimony, that THC was the most closely related substance in the Guidelines. The government produced no evidence at sentencing showing that the synthetic cannabinoids had chemical structures that were substantially similar to a controlled substance in the Guidelines, because no such evidence was available. Given the lack of evidence about the chemical structure, the Guidelines direct that we must consider only the two other factors. *See* U.S.S.G. § 2D1.1 cmt. n.6. Trecki's testimony supported the conclusion that each of the synthetic cannabinoids at issue had (or was likely to have) a stimulant, depressant, or hallucinogenic effect on the central nervous system that was substantially similar to THC. Trecki explained that the synthetic cannabinoids and THC had similar hallucinogenic effects on the brain. In contrast, although marijuana contained THC, marijuana plants contained other chemicals that moderated the effect of the THC.[24] He further testified that most of the synthetic cannabinoids were at least as potent as an equivalent quantity of THC.[25]

---

[24] Nahmani argues that Trecki's opinions were unreliable because he had no human studies showing the effects of the synthetic cannabinoids. But for the reasons set forth in Section III.C.2, we conclude that Trecki's opinions were sufficiently reliable.

[25] Trecki offered no opinion about whether 5-Bromo-UR-144 and 5-Chloro-UR-144 were at least as potent as THC because there were no *in vitro* studies in rodents that would permit him

41

In light of this testimony, we cannot say that the district court clearly erred in relying on Trecki's testimony to find that the synthetic cannabinoids at issue were most similar to THC.[26] Because the district court's factual findings were not clearly erroneous, it follows that the district court did not err in applying the 1:167 marijuana equivalency ratio for THC, even though the conversion ratio has severe results here, especially because much of the weight (more than 1,100 pounds of synthetic cannabinoids) in this case comes from the plant material that was coated with the drugs.

## IV.    CONCLUSION

For the reasons set forth above, we affirm the judgment of the district court.

**AFFIRMED.**

---

to draw conclusions about the potency of these substances.  Because it was not practicable to present evidence about the potency of these substances, the district court did not need to consider this factor with respect to these two substances. *See* U.S.S.G. § 2D1.1, cmt. n.6; *Chowdhury*, 639 F.3d at 586.

[26] This conclusion is consistent with the decisions of our sister circuits that have addressed this issue. *See United States v. Hurley*, 842 F.3d 170, 173 (1st Cir. 2016) (concluding that district court did not err in finding that most closely related substance in the Guidelines to AB-Fubinaca and XLR-11 was THC); *Novak*, 841 F.3d at730 (concluding that district court did not err in finding most closely related substance in the Guidelines to XLR-11, PB-22, and other synthetic cannabinoids was THC); *United States v. Malone*, 828 F.3d 331, 337-38 (5th Cir.) (concluding that district court did not err in finding that most closely related substance in the Guidelines to a synthetic cannabinoid was THC)*, cert. denied sub nom. Green v. United States*, 137 S. Ct. 526 (2016); *United States v. Ramos*, 814 F.3d 910, 919 (8th Cir.) (concluding that district court did not err in finding that most closely related substance in the Guidelines to XLR-11 and other synthetic cannabinoids was THC), *cert. denied*, 137 S. Ct. 177 (2016).